Opinion issued August 25, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00516-CV

———————————

Waterman Steamship Corporation and Maersk Line, Limited, Appellants

V.

Miguel Ruiz,
John Cronan, and Richard E. Hicks, Appellees



 



 

On Appeal from the 164th District Court

Harris County, Texas



Trial Court Case No. 2009-64336

 



 

OPINION ON REHEARING

          Appellee
John Cronan filed a motion for rehearing of our April 14, 2011 opinion.  We grant rehearing, withdraw our April 14,
2011 opinion and judgment and issue this opinion and judgment in their place.  The disposition of the case remains
unchanged.

In this interlocutory appeal,
appellants, Waterman Steamship Corporation (“Waterman”) and Maersk Line,
Limited (“Maersk”), appeal the trial court’s order denying their special
appearances.  Appellees, Miguel Ruiz,
John Cronan, and Richard Hicks, sued Waterman and Maersk for negligence under
the Jones Act and general maritime law for injuries allegedly suffered during
the hijacking of the M/V MAERSK ALABAMA by pirates off the coast of
Somalia.  In four issues on appeal, Waterman
and Maersk contend that the trial court erred in denying the special
appearances because:  (1) appellants
did not waive their special appearances in this case by their actions in
Hicks’s earlier suit; (2) appellants lack sufficient minimum contacts with
Texas to support the exercise of general jurisdiction; (3) exercising personal
jurisdiction under these circumstances does not comport with traditional
notions of fair play and substantial justice; and (4) the trial court erred in
failing to file findings of fact and conclusions of law.  Waterman additionally contends that its
officer, Peter Johnston, had personal knowledge of the facts contained in his
affidavit supporting its special appearance.

          We
affirm in part and reverse and render judgment in part.

 

 

Background

On April 8, 2009, while the M/V
MAERSK ALABAMA was en route from Djibouti to Kenya to deliver food aid cargo,
pirates hijacked the vessel in the Gulf of Aden off the coast of Somalia.  During the ensuing struggle, pirates took
appellees, who were crewmembers on board the ALABAMA, hostage and held them in
the steering room of the vessel. 
Appellees allegedly suffered severe injuries when they were “thrown
about” by the pirates.

Richard Hicks, a Florida resident,
first sued Waterman and Maersk on April 27, 2009, in Harris County, Texas (“the
Hicks case”).  The case was assigned to
the 270th District Court of Harris County. 
Hicks sued appellants under the Jones Act and general maritime and
common law, alleging that appellants’ negligence and the vessel’s
unseaworthiness proximately caused his injuries.  Hicks alleged that appellants “knowingly sent
their employees . . . into pirate-infested waters rather
than take safer routes.”  Hicks contended
that appellants knowingly exposed their employees to “grave and imminent
danger” and did not take “adequate steps to provide appropriate levels of
security and safety for [their] employees.” 
Hicks sought recovery for past and future medical expenses, past and
future pain and suffering and mental anguish damages, and past and future
“maintenance and cure.”  In paragraph two
of his original petition, Hicks alleged that both Waterman and Maersk were
“foreign corporation[s] engaged in business in the State of Texas.”  He did not plead any other facts supporting
personal jurisdiction over Waterman and Maersk.

Waterman is an Alabama corporation,
with its principal place of business in Alabama.  Maersk is a Delaware corporation, with its
principal place of business in Virginia. 
Before filing a special appearance or answering in state court, appellants
removed the Hicks case to federal court. 
In their federal answer, appellants contended that venue was improper in
the Southern District of Texas because Hicks resides in Florida and neither
appellant has a place of business in Harris County or in Texas.  Appellants also asserted that the Southern
District was an inconvenient forum because no witnesses for the case reside in
Texas.  Appellants set out their venue
objection in a separate defense. 
Appellants then answered each of the numbered allegations from Hicks’s
petition.  Regarding Hicks’s paragraph
two, appellants admitted that Hicks is a resident of Florida and that Waterman
and Maersk are both foreign corporations. 
Appellants then denied the “remaining allegations contained in Paragraph
II in the Original Petition,” which included Hicks’s allegation that Waterman
and Maersk were “engaged in business in the State of Texas.”  Appellants did not move for dismissal based
on lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure
12(b)(2).  See Fed. R. Civ. P.
12(b)(2).

While the Hicks case was pending in
federal court, appellants propounded discovery requests.  On September 16, 2009, the Southern District of
Texas remanded the Hicks case to the 270th District Court of Harris County, Texas.  Appellants did not file a special appearance or
take any other action in the Hicks case after the federal court remanded it.

On October 6, 2009, Miguel Ruiz, a
New York resident, also sued Waterman and Maersk in Texas state court (“the
Ruiz case”).  Ruiz’s petition was
substantively identical to Hicks’s first petition, and this case was assigned
to the 164th District Court of Harris County. 
On October 12, 2009, fellow crewmembers Husain Salah, Mohamed
Abdelwaham, Andrew Brzezinski, Mario Clotter, and Hector Sanchez intervened in the
Ruiz case.[1]  On November 6, 2009, John Cronan, a
Pennsylvania resident, also intervened in the Ruiz case.  On December 1, 2009, Hicks nonsuited his case
in the 270th District Court and intervened in the Ruiz case the next day.

Waterman and Maersk filed special
appearances in response to Ruiz’s original petition on December 18, 2009.[2]  In their special appearances, Waterman and
Maersk alleged that they were incorporated in Alabama and Delaware,
respectively, and had their principal places of business in Alabama and
Virginia, respectively.  Both contended
that the trial court could not exercise specific jurisdiction because the
plaintiffs’ cause of action did not arise out of or relate to any contacts
either defendant had with Texas.  They
further contended that the exercise of general jurisdiction was improper
because most of their contacts with Texas were random, fortuitous, and
attenuated, and the contacts did not rise to the level of purposeful availment
of the benefits and protections of Texas law. 
Appellants finally contended that, even if the trial court could
properly exercise general jurisdiction, this exercise would violate traditional
notions of fair play and substantial justice because the case has no connection
to Texas:  all of the parties and
witnesses reside in other states, no evidence exists in Texas, and the
underlying incident occurred off the coast of Somalia.

          Appellees
objected to the special appearance affidavit of Peter Johnston, Waterman’s
Executive Vice President, on the ground that he lacked personal knowledge of
the affidavit’s contents.  Appellees
raised this argument at the special appearance hearing, but the trial court
never specifically ruled on this objection and it never struck Johnston’s affidavit
as incompetent special appearance evidence.

The trial court denied Waterman’s
and Maersk’s special appearances.  Both
appellants requested findings of fact and conclusions of law.  However, they appealed to this court before
the trial court could issue findings and conclusions.  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(7) (Vernon 2008) (allowing interlocutory appeal from order
denying special appearance).

Waiver of Special Appearance

          In
their first issue, appellees contend that Waterman and Maersk waived their
special appearances in the Ruiz case because they did not contest the exercise
of personal jurisdiction in state or federal court in the first-filed Hicks
case.  Waterman and Maersk contend that
Hicks’s nonsuit of his original petition extinguished any waiver of their
objections to personal jurisdiction, and thus Waterman and Maersk did not waive
their special appearances in the Ruiz case. 
We agree with Waterman and Maersk.

          Under
the Texas Rules of Civil Procedure, “[a]t any time before the plaintiff has
introduced all of his evidence other than rebuttal evidence, the plaintiff may
dismiss a case, or take a non-suit, which shall be entered in the
minutes.”  Tex. R. Civ. P. 162; Travelers
Ins. Co. v. Joachim, 315 S.W.3d 860, 862 (Tex. 2010).  A nonsuit “extinguishes a case or controversy
from ‘the moment the motion is filed’ or an oral motion is made in open court . . . .”  Univ.
of Tex. Med. Branch at Galveston v. Estate of Blackmon ex rel. Shultz, 195
S.W.3d 98, 100 (Tex. 2006) (per curiam) (quoting Shadowbrook Apartments v. Abu-Ahmad, 783 S.W.2d 210, 211 (Tex.
1990) (per curiam)).  A nonsuit of the
plaintiff’s cause of action “is not an adjudication of the rights of the
parties and does not extend to the merits of the action; it merely puts them
back in the position they were in before the lawsuit was brought.”  Parker
v. JPMorgan Chase Bank, 95 S.W.3d 428, 431–32 (Tex. App.—Houston [1st
Dist.] 2002, no pet.); Rexrode v. Bazar,
937 S.W.2d 614, 619 (Tex. App.—Amarillo 1997, no writ) (“[A] non-suit is a
termination of the pleaded causes of action and asserted defenses without an
adjudication of their merits that returns the litigants to the positions they
occupied before the plaintiff invoked the court’s jurisdiction.”); see also Houston Indep. Sch. Dist. v. Morris,
No. 01-10-00043-CV, 2011 WL 1936005, at *7 (Tex. App.—Houston [1st Dist.] May
19, 2011, no pet. h.) (“When the Taxing Units nonsuited their claims for
delinquent taxes, the Taxpayers’ affirmative defense became
moot . . . .”). 
Although a nonsuit may vitiate certain interlocutory orders, rendering
them moot and unappealable, a plaintiff’s decision to nonsuit his claims does
not affect a defendant’s right to be heard on a pending claim for affirmative
relief.[3]  See Tex. R. Civ. P. 162; Villafani v. Trejo, 251 S.W.3d 466, 469
(Tex. 2008).

          Here,
Hicks first sued Waterman and Maersk on April 27, 2009, in Texas state
court.  This case was assigned to the
270th District Court.  Hicks did not
allege that Waterman and Maersk committed a tort in Texas, nor did he plead
specific bases for personal jurisdiction; instead, Hicks merely stated that
Waterman and Maersk were both foreign corporations “engaged in business in the
State of Texas.”

          After
Waterman and Maersk removed the Hicks case to federal court, they answered and,
in their first defense, asserted that venue was improper in the Southern
District of Texas and that this district was an inconvenient forum because no
parties or witnesses reside in Texas. 
Although Waterman and Maersk asserted nine other defenses, they did not
state an objection to personal jurisdiction in a separate defense.  Waterman and Maersk did, however, answer the
specific allegations included in Hicks’s petition.  Waterman and Maersk stated the following:

With regard to the
allegations contained in Paragraph II, subparagraph 1, it is admitted that the
plaintiff is a resident of the Royal Palm Beach, Florida.  With respect to the allegations of Paragraph
II, subparagraphs 2 and 3, it is admitted that Waterman and [Maersk] are a
foreign corporations.  The remaining
allegations contained in Paragraph II in the original petition are denied.

 

Paragraph II, subparagraphs 2 and 3, contained
Hicks’s statement that Waterman and Maersk “engaged in business in the State of
Texas.”  Waterman and Maersk did not make
a separate motion objecting to personal jurisdiction under Federal Rule 12(b).

          The court
for the Southern District of Texas remanded the Hicks case to the 270th
District Court on September 16, 2009.  On
October 6, 2009, Ruiz filed a substantively identical suit in Harris County,
and this case was assigned to the 164th District Court.[4]  Over the next two months, several of Ruiz’s
crewmembers, including Cronan, intervened in his suit.  On December 1, 2009, Hicks nonsuited his case
and immediately intervened in the Ruiz case. 
Waterman and Maersk filed a special appearance in the Ruiz case on December
18, 2009.

          When
Hicks nonsuited his case, the effect of this action was to extinguish his
causes of action against Waterman and Maersk and to return the parties to the
positions they were in before Hicks invoked the jurisdiction of the trial
court.  See Estate of Blackmon, 195 S.W.3d at 100; Parker, 95 S.W.3d at 431–32; Rexrode,
937 S.W.2d at 619.  As a result of the
nonsuit, it was as if Hicks had never brought suit against Waterman and Maersk
in the first place.  See Hagberg v. City of Pasadena, 224 S.W.3d 477, 484 (Tex.
App.—Houston [1st Dist.] 2007, no pet.) (“When a party nonsuits a legal action,
the parties are put back in the same positions as before the filing of the
suit.”); KT Bolt Mfg. Co. v. Tex. Elec.
Coops., Inc., 837 S.W.2d 273, 275 (Tex. App.—Beaumont 1992, writ denied)
(“[A nonsuit] merely places [the parties] in the position that they were in
before the court’s jurisdiction was invoked just as if the suit had never been
brought.”); see also Bailey v. Gardner,
154 S.W.3d 917, 920 (Tex. App.—Dallas 2005, no pet.) (holding same).  Thus, even if Waterman and Maersk waived
their objections to personal jurisdiction in the Hicks case—a matter we need
not decide because Hicks’s nonsuit returned the parties to their pre-filing
positions—any waiver in the Hicks case was extinguished by the nonsuit and
cannot operate as a basis for denying Waterman’s and Maersk’s special
appearances in the Ruiz case.

          Cronan,
citing the Fort Worth Court of Appeals’ decision in Reynolds v. Murphy, 266 S.W.3d 141 (Tex. App.—Fort Worth 2008, pet.
denied), argued that Rule 162 “does not vitiate the effect of a trial court’s
previous rulings or divest a trial court of personal jurisdiction over a
defendant to decide matters in a second suit that have already been decided in
a previously filed suit.”  In Reynolds, after the trial court, on
remand, granted the defendant’s motion to strike the additional causes of
action asserted in the plaintiff’s third amended petition, filed after the
remand, the plaintiff nonsuited and appealed. 
Id. at 144.  In response to the defendant’s argument on
appeal that the nonsuit rendered the case and appeal moot, the Fort Worth court
concluded that the trial court’s ruling essentially dismissed the newly
asserted claims with prejudice and was analogous to a partial summary judgment,
which is a ruling on the merits.  Id. at 146.  As a result, the plaintiff’s nonsuit did not
vitiate the trial court’s ruling, and the court held that it had jurisdiction
over the appeal.  Id.

          A
nonsuit “cannot be used to disturb a court’s judgment on the merits of a
claim,” but the Texas Supreme Court has also held that a nonsuit can “vitiate
certain interlocutory orders.”  See Villafani, 251 S.W.3d at 469 (citing
Estate of Blackmon, 195 S.W.3d at 101
(holding that nonsuit mooted interlocutory appeal of denial of plea to the
jurisdiction and deprived court of appeals of jurisdiction)); Le v. Kilpatrick, 112 S.W.3d 631, 634
(Tex. App.—Tyler 2003, no pet.) (holding that nonsuit vitiated order denying
special appearance).  Here, neither the
state nor the federal district court had issued any interlocutory rulings, on
the merits or otherwise, at the time Hicks nonsuited his case.[5]

          We
conclude that the nonsuit in the Hicks case had the effect of extinguishing any
waiver by Waterman and Maersk of their objections to personal
jurisdiction.  Thus, we hold that appellees
cannot use any alleged waiver in the Hicks case to establish waiver of the
special appearances in the Ruiz case. 
Because the special appearances were the first instruments filed by
Waterman and Maersk in the Ruiz case, we hold that they did not waive their
objections to personal jurisdiction.  See Tex.
R. Civ. P. 120a(1) (“Such special appearance shall be made by sworn
motion filed prior to motion to transfer venue or any other plea, pleading or
motion . . . .”).

Evidentiary Objection

In its third issue, Waterman
contends that Peter Johnston, its Executive Vice President and an officer of
Waterman, had personal knowledge of the contents of his special appearance
affidavit and thus his affidavit was competent to support its special
appearance.  We address this contention
before addressing the merits of Waterman’s special appearance.

Texas Rule of Civil Procedure
120a(3) provides that the affidavits, if any, in support of a special
appearance shall be “made on personal knowledge, shall set forth specific facts
as would be admissible in evidence, and shall show affirmatively that the affiant
is competent to testify.”  Tex. R. Civ. P. 120a(3).  A corporate officer may testify that
information concerning the company’s contacts with the forum state is within
his personal knowledge “without showing with particularity how he acquired that
knowledge.”  M.G.M. Grand Hotel, Inc. v. Castro, 8 S.W.3d 403, 407 (Tex.
App.—Corpus Christi 1999, no pet.); see
also Exito Elecs. Co. v. Trejo, 99 S.W.3d 360, 372 (Tex. App.—Corpus
Christi 2003) (“With regard to the personal knowledge of corporate representatives,
officers such as vice-presidents, secretaries, and board presidents may testify
to facts regarding the corporation’s activities.”), rev’d on other grounds, 142 S.W.3d 302 (Tex. 2004) (per
curiam).  Even if an affiant later states
that his affidavit testimony was based on his review of corporate business
records, the affiant’s “acknowledgement of the sources from which he gathered
his knowledge does not violate the personal knowledge requirement.”  In re
E.I. DuPont de Nemours & Co., 136 S.W.3d 218, 224 (Tex. 2004); see also Asshauer v. Glimcher Realty Trust,
228 S.W.3d 922, 926 (Tex. App.—Dallas 2007, no pet.).

Peter Johnston is Waterman’s
Executive Vice President.  In his
affidavit, he stated that he had personal knowledge of the facts contained in the
affidavit and that those facts were true and correct.  Johnston averred that only two of the
crewmembers of the M/V MAERSK ALABAMA were Texas residents and that neither of
those crewmembers was a party to this lawsuit. 
He also described the process of hiring crewmembers through various
unions and the isolated port calls by Waterman-owned ships to Texas ports.  He further averred that Waterman did not have
an office, bank account, property, telephone listing, registered agent, or
employees in Texas.  Johnston also stated
that Waterman did not advertise in Texas and was not registered to do business
in Texas.

During Johnston’s deposition,
Cronan’s counsel went through Johnston’s affidavit and asked him how he had
obtained knowledge of each specific averment. 
For example, when asked how Johnston was aware of the residences of the
MAERSK ALABAMA crewmembers, Johnston responded that Waterman’s crewing
department provided him with that information, and Johnston then agreed with
counsel’s follow-up question that that information “was not something within
[his] personal knowledge before [he] went and asked a third party the
answer.”  Johnston testified that he
obtained the following information from third parties before making his
affidavit:  (1) whether Waterman was
registered to do business in Texas; (2) whether Waterman had a registered agent
or employees working in Texas; (3) whether Waterman had an office, bank
account, property, or phone listing in Texas; and (4) what the union protocols
were for hiring crewmembers.  Appellees
contend that, because Johnston relied upon third parties and business records
to obtain this information, he lacked personal knowledge of the facts recited
in his affidavit, and therefore the affidavit was “no evidence” of Waterman’s
Texas contacts.

As a corporate officer, Johnston
may testify that facts concerning Waterman’s contacts with Texas are within his
personal knowledge without specifying how he obtained that knowledge.  See
Castro, 8 S.W.3d at 407; see also
Trejo, 99 S.W.3d at 372 (holding that corporate officers can testify to
facts regarding corporation’s activities). 
The fact that Johnston acknowledged that he learned of the specific
information concerning Waterman’s Texas contacts from third parties and
business records before making his affidavit “does not violate the personal
knowledge requirement.”  See E.I. DuPont de Nemours, 136 S.W.3d
at 224; see also Asshauer, 228 S.W.3d
at 926.  We therefore hold that Johnston
had personal knowledge of the facts contained within his affidavit, and the
trial court could properly consider this affidavit when determining Waterman’s
special appearance.[6]

Personal Jurisdiction Standard of Review

          Whether
a court has personal jurisdiction over a defendant is a question of law that we
review de novo.  BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794; Glattly v. CMS Viron Corp., 177 S.W.3d
438, 445 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  Before determining the jurisdictional
question, the trial court must frequently resolve questions of fact.  BMC
Software, 83 S.W.3d at 794.  If the
trial court does not issue findings of fact and conclusions of law, “all facts
necessary to support the judgment and supported by the evidence are
implied.”  Id. at 795.  Under these
circumstances, we presume that the trial court resolved all factual disputes in
favor of its judgment.  Tri-State Bldg. Specialties, Inc. v. NCI
Bldg. Sys., L.P., 184 S.W.3d 242, 246 (Tex. App.—Houston [1st Dist.] 2005,
no pet.) (citing Am. Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002)).  These findings are not conclusive when the
appellate record includes both the clerk’s and reporter’s records, and a party
may challenge these findings for legal and factual sufficiency on appeal.  Id.  To the extent that the underlying facts are
undisputed, however, we conduct a de novo review.  Glattly,
177 S.W.3d at 445.

Requirements for Personal Jurisdiction

          Two
requirements must be met before a Texas court can exercise personal
jurisdiction over a nonresident defendant. 
First, the Texas long-arm statute must authorize the exercise of
jurisdiction; and, second, the exercise of jurisdiction must comport with
federal due process guarantees.  Coleman, 83 S.W.3d at 806; Tri-State, 184 S.W.3d at 248.

          Pursuant
to the long-arm statute, Texas courts can exercise personal jurisdiction over a
nonresident defendant that “does business” in Texas.  Tex.
Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 2008); BMC Software, 83 S.W.3d at 795.  The statute lists three activities that
constitute “doing business” in Texas: 
(1) contracting with a Texas resident when either party is to
perform the contract in whole or in part in Texas; (2) committing a tort in
whole or in part in Texas; and (3) recruiting Texas residents for employment
inside or outside of Texas.  Tex. Civ. Prac. & Rem. Code Ann.
§ 17.042.  This list, however, is
not exclusive, and the “doing business” requirement is limited only by the
requirements of federal due process.  Koll Real Estate Group, Inc. v. Purseley,
127 S.W.3d 142, 146 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing Schlobohm v. Schapiro, 784 S.W.2d 355,
356 (Tex. 1990)); see also CSR Ltd. v.
Link, 925 S.W.2d 591, 594 (Tex. 1996). 
In practice, these two conditions are combined into one requirement of
due process.  Wright v. Sage Eng’g, Inc., 137 S.W.3d 238, 247 (Tex. App.—Houston
[1st Dist.] 2004, pet. denied); see also
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815
S.W.2d 223, 226 (Tex. 1991) (“[W]e consider only whether it is consistent with
federal constitutional requirements of due process for Texas courts to assert in personam jurisdiction over Guardian
Royal.”).

          With
respect to personal jurisdiction, federal due process requires two things.  First, the non-resident defendant must have
purposefully established such minimum contacts with the forum state that the
defendant could reasonably anticipate being sued there.  Glattly,
177 S.W.3d at 447 (citing Burger King
Corp. v. Rudzewicz, 471 U.S. 462, 475–76, 105 S. Ct. 2174, 2183–84
(1985)).  Second, if the non-resident
defendant has purposefully established minimum contacts with the forum state,
the exercise of personal jurisdiction must comport with traditional notions of
fair play and substantial justice.  Id. (citing Burger King, 471 U.S. at 475–76, 105 S. Ct. at 2183–84).  The defendant bears the burden of presenting
a “compelling case” that exercising jurisdiction over it would not be fair and
just.  See id. at 450.  Only in rare
cases will a Texas court’s exercise of personal jurisdiction not comport with
fair play and substantial justice when the non-resident defendant has
purposefully established minimum contacts. 
Guardian Royal, 815 S.W.2d at
231.

          The
plaintiff bears the initial burden of pleading jurisdictional facts sufficient
to bring a non-resident defendant within the provisions of the Texas long-arm
statute.  Kelly v. Gen. Interior Constr., Inc., 301 S.W.3d 653, 658 (Tex.
2010).  To establish jurisdiction over a
non-resident defendant, the plaintiff must plead a “connection between the
defendant[’s] alleged wrongdoing and the forum state.”  Id.
at 655; Touradji v. Beach Capital P’ship,
L.P., 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.).  In a tort case, the plaintiff must plead that
the defendant committed a tortious act in Texas.  Kelly,
301 S.W.3d at 659; Touradji, 316
S.W.3d at 23.

A nonresident defendant challenging
the court’s exercise of personal jurisdiction through a special appearance
bears the burden of negating all grounds for personal jurisdiction alleged by
the plaintiff.  Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex.
2007).  The defendant can negate
jurisdiction on either a factual or legal basis.  Kelly,
301 S.W.3d at 659; RSR Corp. v. Siegmund,
309 S.W.3d 686, 699 (Tex. App.—Dallas 2010, no pet.).  To negate personal jurisdiction on a factual
basis, the defendant can produce evidence showing that it has no contacts with
Texas, which the plaintiff may then counter with its own evidence.  Kelly,
301 S.W.3d at 659.  To negate
jurisdiction on a legal basis, the defendant can establish that, even taking
the alleged jurisdictional facts as true, “the defendant’s contacts with Texas
fall short of purposeful availment . . . or that
traditional notions of fair play and substantial justice are offended by the
exercise of jurisdiction.”  Id.; Siegmund,
309 S.W.3d at 699.

Minimum Contacts

A.  
Standard of Review

In their first issue, appellants
contend that they are not subject to personal jurisdiction in Texas because
they have not established minimum contacts with Texas.

A non-resident defendant
establishes minimum contacts with Texas by purposefully availing itself of the
privileges and benefits inherent in conducting business in Texas.  Michiana
Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005); see also Kelly, 301 S.W.3d at 660
(“[J]urisdictional analysis always centers on the defendant’s actions and choices to enter the forum state and
conduct business.”) (emphasis in original). 
There are three aspects to the “purposeful availment” inquiry:  (1) we consider only the defendant’s
contacts with the forum state, not the unilateral activities of third parties
or persons; (2) the contacts relied upon must be purposeful, and not random,
isolated, or fortuitous; and (3) the defendant must seek some benefit,
advantage, or profit by availing itself of the jurisdiction.  Holten,
168 S.W.3d at 785.  When undertaking a
minimum contacts analysis, we consider the quality and nature of the
defendant’s contacts, rather than their number. 
Trigeant Holdings, Ltd. v. Jones,
183 S.W.3d 717, 725 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  The defendant’s activities, whether they
consist of acts inside or outside of Texas, must “justify a conclusion that the
defendant could reasonably anticipate being called into a Texas court.”  Siegmund,
309 S.W.3d at 698 (citing Coleman, 83
S.W.3d at 806).

          The
minimum contacts analysis is further divided into specific and general
jurisdiction.[7]  A court may exercise general jurisdiction if
the defendant’s contacts with the forum state are continuous and systematic,
even if the cause of action did not arise out of or relate to the defendant’s
contacts with the forum.  Glattly, 177 S.W.3d at 447.  The minimum contacts analysis involved when
general jurisdiction is asserted is more demanding than when a plaintiff
asserts specific jurisdiction.  Coleman, 83 S.W.3d at 807.  In a general jurisdiction analysis, we do not
view each contact in isolation, but instead investigate, compile, sort, and
analyze all contacts “for proof of a pattern of continuing and systematic
activity.”  Id. at 809.  To satisfy the
requirements of general jurisdiction, “[u]sually, the defendant must be engaged
in longstanding business in the forum state, such as marketing or shipping
products, or performing services or maintaining one or more offices there;
activities that are less extensive than that will not qualify for general in
personam jurisdiction.”  PHC-Minden, L.P. v. Kimberly-Clark Corp.,
235 S.W.3d 163, 168 (Tex. 2007) (quoting 4 Charles
Alan Wright & Arthur R. Miller, Federal Practice & Procedure
§ 1067.5 (2007)); Touradji, 316
S.W.3d at 25.

B.  
Waterman’s Contacts with Texas

On appeal, appellees contend that
Waterman has “continuous and systematic” contacts with Texas, which subject it
to general jurisdiction.[8]  Appellees do not dispute Waterman’s
contentions that:  (1) it is not
registered to do business in Texas; (2) it does not have a registered agent,
office, property, mailing address, bank account, or phone listing in Texas; (3)
it does not maintain business records in Texas; (4) it has not received revenue
from a Texas entity or person; (5) it has not solicited business in Texas
or had a Texas customer; and (6) it has not marketed its services or
directed advertising toward Texas.

1.     Calls upon Texas Ports

During the jurisdictional discovery
period, five Waterman vessels made a total of eighteen calls on Texas ports
while under time-charter to third-party customers of Waterman.  In his deposition, Peter Johnston, Waterman’s
Executive Vice President, testified that, under a time charter, Waterman is
responsible for crewing the vessel, performing maintenance, ensuring regulatory
compliance, issuing orders to the master and the crew, operating the vessel,
and determining the particular course. 
The time-charterer gives the master the “voyage instructions”:  where to
go, the ports to call upon, the specific cargo to unload at particular ports,
and the itinerary for the voyage. 
Johnston stated that “most” of Waterman’s vessels are time-chartered to
third parties, and all of the calls upon Texas ports were made at the direction
of third-party charterers.  For example,
the Waterman vessel GREEN BAY made one call on a Texas port in May 2009 at the
direction of the federal government to pick up military cargo located in Texas.

We do not construe Waterman’s Texas
port calls as “substantial contacts of a quality sufficient to establish a
court’s general jurisdiction over a nonresident defendant.”  Uche v.
Allison, 264 S.W.3d 90, 100 (Tex. App.—Houston [1st Dist.] 2007, pet. denied);
see also Asarco, Inc. v. Glenara, Ltd.,
912 F.2d 784, 787 (5th Cir. 1990) (finding no jurisdiction and discounting
quality of twenty calls on Louisiana ports because managing company did not
choose destination of particular ports); Nicolaisen
v. Toei Shipping Co., 722 F. Supp. 1162, 1165 (D.N.J. 1989) (seventeen port
calls during four year period did not establish general jurisdiction when made
at direction of third-party time-charterer). 
The quality of port calls as a contact is further diminished when a
third-party determines the location of the call.  See
Farwah v. Prosperous Maritime Corp., 220 S.W.3d 585, 591 (Tex.
App.—Beaumont 2007, no pet.) (“Generally, with respect to vessel owners and
managers who do not direct the itinerary of the vessel, port calls are not
construed as substantial contacts of a quality sufficient to establish a
court’s general jurisdiction over a nonresident defendant.”); see also Coleman, 83 S.W.3d at 809
(discounting quality of defendant’s attendance at conferences in Texas when
defendant did not choose location); Reyes
v. Marine Drilling Cos., 944 S.W.2d 401, 402–04 (Tex. App.—Houston [14th
Dist.] 1997, no writ) (discounting quality of at least 200 trips to Texas to
perform inspections required under contractual obligations with federal
government).

Waterman made eighteen port calls
over a nearly seven year time period, which is better characterized as sporadic
rather than “continuous and systematic” contacts.  See
Asarco, 912 F.2d at 787.  Furthermore, Waterman presented evidence
that it called upon Texas ports only at the direction of third-party time‑charterers,
who determined the specific destinations for the vessel, and that Waterman did
not make the decision to take its vessels to Texas.  See
Farwah, 220 S.W.3d at 592.  We
therefore conclude that the third-party time-chartered calls upon Texas ports
by Waterman vessels are insufficient, standing alone, to establish general
jurisdiction over Waterman because Waterman “lacked control over the decisions
that led to the vessels calling on Texas ports.”  Id.

2.     Purchases of Goods and Services from Texas
Vendors

Appellees further contend that
Waterman paid “millions” to Texas vendors while its vessels were in Texas
ports, it contracted with Texas residents and companies, and it had vessels and
barges inspected and repaired in Texas ports.[9]

Mike Cameron, Waterman’s Vice
President of Fleet Services, testified in his deposition that when a Waterman
vessel calls upon a port, Waterman appoints a “port agent” and authorizes that
agent to “carry out the necessary husbanding services for the vessel” while it
is in port.[10]  According to Cameron, Waterman’s Purchasing
Department, not the port agent, handles the purchase of fuel, stores, food, and
other supplies while in port.  During the
jurisdictional discovery period, Waterman purchased $2,000,000 in goods and
services, including vessel repairs, while its vessels were located in Texas
ports.  All of Waterman’s purchases and
contracts with Texas vendors occurred in conjunction with third-party
time-chartered port calls or federal government contracts.

Cameron also testified that
Waterman paid for inspections and repairs to barges located in Texas
ports.  Cameron stated that Waterman
contracted with the federal government to deliver food-aid cargo, and the
United States Department of Agriculture required inspections and repairs to
barges before loading the cargo to ensure that the barges were in an acceptable
condition for the transport.  Waterman
bid on the available food-aid contracts with the federal government “knowing
that a number of the shipments would be out of Texas ports.”  According to Cameron, Waterman engaged in
these shipments “very infrequent[ly].” 
Cameron testified that the government, not Waterman, determines the
particular port from which the cargo is loaded onto Waterman barges and
vessels.

In his affidavit, Johnston averred
that Waterman purchased two vessels from a Dutch company in 2004, both of
which, the BUENOS AIRES and the SANTA CRUZ, were located in Houston at the time
of purchase.  These vessels remained in
the Port of Houston for approximately three weeks while they received “minor
modifications” and were re-flagged to the United States flag.

Mere purchases or their equivalent,
even if occurring at regular intervals, are insufficient to warrant the
exercise of personal jurisdiction over the non-resident defendant when the
purchases do not relate to the cause of action. 
See Helicopteros Nacionales de
Columbia, S.A. v. Hall, 466 U.S. 408, 418, 104 S. Ct. 1868, 1874 (1984); PHC-Minden, 235 S.W.3d at 170; Coleman, 83 S.W.3d at 808; BMC Software, 83 S.W.3d at 798 (“BMCB’s
unrelated purchases in Texas from BMCS are not the type of contacts that
justify a finding that BMCB could have ‘reasonably anticipate[d] being haled
into court’ here.”); Farwah, 220
S.W.3d at 593 (“Even if the evidence supported a finding that Valles conducted
business on as many as 265 days during that twenty-seven month period, the
nature of the contacts, consisting of the purchase of necessary services and
supplies for the vessel, is not sufficiently continuous and not of a sufficient
quality to satisfy the requirements of the Constitution.”).  Repairs, including the purchase of inspection
and re-flagging services, are construed as “purchases” under Helicopteros, and not as separate and
distinct contacts.  See HMS Aviation v. Layale Enters., S.A., 149 S.W.3d 182, 194–95
(Tex. App.—Fort Worth 2004, no pet.).

We also consider whether “the
choice to do business in Texas” was Waterman’s or “merely a coincidence because
of another entity’s decision to direct the vessels to Texas.”  See
Farwah, 220 S.W.3d at 594.  In Farwah, the Beaumont Court of Appeals
held that the only reason Valles purchased supplies and entered into contracts
in Texas was that Standard Tankers, the charterer, chose Texas ports of call
and, therefore, this arrangement “diminish[ed] the quality of Valles’s
contacts” and supported a ruling that Valles did not purposefully direct
business activity to Texas.  Id.

Here, during the jurisdictional
discovery period, Waterman purchased approximately $2,000,000 in necessary
goods and services, including inspection and repair services, from Texas
vendors.  Waterman’s special appearance
evidence indicates that Waterman made these purchases when its vessels called
upon Texas ports at the direction of third-parties and when the federal
government directed Waterman to load food-aid cargo in Texas ports and
Waterman’s barges needed inspection and repairs pursuant to its contractual
obligations with the government.  In each
instance where Waterman contracted with third-parties to transport food-aid
cargo, the commodities were located in Houston, but Waterman’s vessels were
located either in New Orleans or, on one occasion, Galveston.  Waterman had to use barges to transport the
commodities to its vessels.  Because the
commodities included food, both the commodities and the barges had to be
inspected to ensure that Department of Agriculture standards were met.  The only reasonable place to inspect the
commodities and barges prior to loading in the Port of Houston was the
shipyards and inspection stations located in and around that port.  There is no evidence that Waterman obtained
barge inspections in Texas that were not connected to any of its food-aid
transport contracts.  When Waterman
needed to load food-aid cargo in Texas and the barge needed repairs before the
voyage, Waterman contracted for repair services in Texas as a “cost-effective
measure.”  Appellees argue that this
statement “undermines” Waterman’s assertion that its contacts with Texas were
at the direction of a third party.

Even if Waterman obtained repairs
to its vessels and barges in Texas, these contracts and purchases, by
themselves, are still insufficient to support the exercise of general
jurisdiction.  See Helicopteros, 466 U.S. at 418, 104 S. Ct. at 1874; HMS Aviation, 149 S.W.3d at 194–95
(holding purchase of repair services insufficient to support general
jurisdiction even though HMS Aviation brought planes to Texas solely for
purpose of obtaining repairs).  There is
no evidence that Waterman entered into any other contracts with Texas
residents.  We therefore conclude that
Waterman’s $2,000,000 in purchases of goods and services from Texas vendors,
standing alone, does not establish general jurisdiction.

Appellees additionally assert that
Waterman regularly contacted Texas residents, such as the Houston office of the
American Bureau of Shipping (“ABS”), “regarding vessel inspections, surveys,
testing, and other services performed on Waterman’s vessels.”  Minimum contacts “may not be satisfied by
merely engaging in communications with a Texas corporation during performance
of a contract.”  Credit Commercial de France, S.A. v. Morales, 195 S.W.3d 209,
220–21 (Tex. App.—San Antonio 2006, pet. denied); see also Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d
327, 344 (5th Cir. 2004) (“Moreover, this Court has repeatedly held that the
combination of mailing payments to the forum state, engaging in communications
related to the execution and performance of the contract, and the existence of
a contract between the nonresident defendant and a resident of the forum state
are insufficient to establish the minimum contacts necessary to support the
exercise of specific personal jurisdiction over the nonresident
defendant.”).  Any communication between
Waterman and ABS or any other entity providing services to Waterman’s vessels
is merely incidental to “developing and carrying out the contractual
obligations,” and therefore does not constitute purposeful availment of the
benefits and protection of Texas law.  See Morales, 195 S.W.3d at 220–21.

3.     Employment of Texas Residents

Appellees contend that Waterman has
employed hundreds of Texas residents since 2003 and that it had a “continuing
contractual relationship” with a Texas crewmember of the MAERSK ALABAMA, and
therefore this factor supports the exercise of general jurisdiction.  Waterman acknowledges that it has employed
approximately 200 Texas mariners since 2003 and that two of the crewmembers on
the MAERSK ALABAMA were Texas residents, but it contends that this is not a purposeful
contact because it hired all mariners pursuant to union protocols, it had
limited discretion to reject a mariner chosen by the unions, and it could not
solicit or recruit employees from a particular state.

In his deposition, Mike Cameron
testified regarding the procedure for hiring mariners for Waterman’s
vessels.  Cameron testified that Waterman
contracts with three seafarers’ unions. 
When Waterman needs a crew, it sends a job order to the national union
headquarters.  The national union then
contacts the union hall located closest to the vessel’s next port.  The local union hall then posts a “job call,”
and the union members can bid on which jobs they want.  The national union then determines which
member will fill which position and notifies Waterman.  Waterman reviews the member’s paperwork,
including his licenses and passports, and also requires a physical.  If the member’s paperwork is in order and he
passes the physical, Waterman hires the member for the particular voyage.  Waterman can decline to hire a crewmember
only under limited circumstances, which do not include residence of the
crewmember.  Johnston stated that
Waterman had to replace the entire crew of the BUENOS AIRES after Waterman
purchased the vessel and that, because the vessel was located in Houston at the
time of the purchase, the national unions hired out of Texas union halls.

Cameron also testified that
Waterman can hire “permanent employees” for certain positions on its vessels,
such as the captain, pursuant to its union contracts.  In these circumstances, after the mariner has
worked on Waterman vessels, Waterman may offer a permanent position to
him.  The mariner has the right to
decline, and the permanent position must be approved by the union.  Cameron testified that the first assistant
engineer on board the MAERSK ALABAMA was a permanent employee who resided in
Texas.

Employment of 200 Texas resident
mariners does not constitute a purposeful contact with Texas.  See
Johns Hopkins Univ. v. Nath, 238 S.W.3d 492, 501 (Tex. App.—Houston [14th
Dist.] 2007, pet. denied); All Star
Enter., Inc. v. Buchanan, 298 S.W.3d 404, 416, 419 n.12 (Tex. App.—Houston
[14th Dist.] 2009, no pet.) (holding that “a third party’s choice of residence,
whether a royalty-interest owner or an employee, is not conduct by the
nonresident corporation directed at the forum state”).  Waterman does not require its mariners to
live in Texas—those mariners that are
Texas residents live here “of their own accord.”  See
Nath, 238 S.W.3d at 501.  When
determining whether a defendant established purposeful contacts with Texas, we
consider only the defendant’s own actions. 
Holten, 168 S.W.3d at
785.  Evidence that Waterman employs
Texas residents on its vessels is not sufficient for general jurisdiction
because “it demonstrates only the unilateral choices of third parties who have
some connection to [the defendant], rather than contacts and conduct by [the
defendant].”  See Buchanan, 298 S.W.3d at 416.

4.     Payment of Texas Franchise Taxes

Appellees further contend that
Waterman’s payment of Texas franchise taxes indicates that it does business in
Texas and has continuous and systematic contacts with Texas.

Waterman acknowledges that it filed
Texas franchise tax returns, but it contends that its franchise tax liability
was premised on the number of days Waterman vessels spent in Texas ports per
year, and not on revenue received in Texas or from Texas companies.  Miguel Estrada, Waterman’s Chief Financial
Officer, testified in his deposition that Waterman files franchise taxes for
every state in which a Waterman vessel goes into port or operates within the
state’s waters.  According to Estrada,
stopping in a port to load or unload cargo and traversing the state’s waters
triggers an “apportionment” for franchise tax liability purposes.  Waterman bases its filings on the amount of
time spent in Texas ports per year, and Estrada characterized the amounts that
Waterman pays as “de minimus” and “immaterial.” 
As examples, Estrada stated that Waterman’s Texas franchise tax liability
for 2006 was $1400 and the apportionment percentage for 2005 was only
0.7%.  Waterman contends that this
percentage reflects that Waterman vessels only sporadically called upon Texas
ports in 2005.  Waterman did not receive
any revenue in Texas, nor did it receive any revenue from a Texas company.

Payment of franchise taxes does not
automatically establish personal jurisdiction, but only “potentially subjects a
foreign corporation to jurisdiction in the state.”  Asshauer,
228 S.W.3d at 933; Conner v.
ContiCarriers & Terminals, Inc., 944 S.W.2d 405, 417–18 (Tex.
App.—Houston [14th Dist.] 1997, no writ) (plurality op.).

We conclude that Waterman’s payment
of franchise taxes, which is based solely on the number of days Waterman
vessels are in Texas ports per year and does not constitute a significant
portion of its tax liability, does not establish general jurisdiction.

5.     Trips to Texas by Waterman Employees

As further evidence that Waterman
has “continuous and systematic” contacts with Texas, appellees point to Peter
Johnston’s trip to Texas to accept delivery of three vessels, “routine trips”
to Texas by a port engineer when Waterman vessels need repairs while in Texas
ports, and trips to meet with ABS employees in Houston.

Waterman acknowledges that Johnston
visited Texas in 2004 to accept delivery of the BUENOS AIRES and the SANTA
CRUZ, which were located in Houston at the time Waterman purchased the vessels
from a Dutch company.  Johnston also
testified that he once visited ABS in Houston and that Waterman’s port
engineers may travel to Texas ports if a vessel located in Texas needs
repairs.  Other than his own trips,
Johnston could not identify specific trips to Texas by Waterman employees.  Johnston did not know the frequency with
which the port engineer trips occurred, although he disagreed that these trips
occurred on a “routine basis.”  He noted
that most issues with ABS are resolved by telephone or e-mail and not by
in-person visits to Houston.

Occasional travel to Texas is
insufficient by itself to establish continuous and systematic contact with the
state.  See Uche, 264 S.W.3d at 99 (holding that doctor’s weekly trips to
Texas onboard cruise ship embarking from Galveston were insufficient to
constitute continuous and systematic contact); see also Helicopteros, 466 U.S. at 418, 104 S. Ct. at 1874 (holding
that trips to Texas for training were “part of the package of goods and
services purchased by Helicol from Bell Helicopter” and did not constitute
sufficient contacts to support general jurisdiction).

Here, any trips to Texas by port
engineers were related to Waterman’s purchase of repair and inspection services
from ABS and other Texas entities. 
Johnston traveled to Texas to accept delivery of the BUENOS AIRES and
the SANTA CRUZ because the vessels were fortuitously located in Texas at the time
Waterman purchased the vessels.  See Transportes Aereos de Coahuila, S.A. v.
Falcon, 5 S.W.3d 712, 720 (Tex. App.—San Antonio 1999, pet. denied) (“With
regard to the few trips that were made by TACSA to retrieve parts and to take
delivery of the aircraft, we note that the number of those trips was far less
than the trips taken into Texas in the Helicopteros
case and far less substantial in nature. . . .  In the
instant case, personnel were sent to Texas once to take delivery of the
aircraft and infrequently thereafter to purchase supplies, parts and fuel.”); cf. Coleman, 83 S.W.3d at 809 (holding
that five trips to Texas to attend national conferences did not support general
jurisdiction when defendant did not select location of conferences); Reyes, 944 S.W.2d at 404 (holding same
for 204 trips to Texas for inspections and reviews required by federal
contractual obligations).

We conclude that Waterman
employees’ trips to Texas were sporadic—such as Johnston’s trip to take delivery of the vessels—or part and parcel of Waterman’s service
contracts with Texas vendors and ABS—the trips by the port engineers. 
The trips to Texas in the performance of Waterman’s contracts with Texas
vendors, while a factor weighing in favor of jurisdiction, are not sufficient
by themselves to establish general jurisdiction over Waterman.  See
Falcon, 5 S.W.3d at 720 (comparing trips to Texas in that case—involving delivery of aircraft and purchases of
supplies, parts, and fuel—with trips
to Texas in Helicopteros—training of personnel—where trips did not establish general
jurisdiction).

6.     Waterman’s Website

Appellees further contend that
Waterman maintains an interactive website sufficient to support general
jurisdiction, and that Waterman produced no evidence that it only had a passive
internet presence.

Internet use is characterized as
falling within three categories on a sliding scale for purposes of establishing
personal jurisdiction.  Choice Auto Brokers, Inc. v. Dawson, 274
S.W.3d 172, 177–78 (Tex. App.—Houston [1st Dist.] 2008, no pet.); Michel v. Rocket Eng’g Corp., 45 S.W.3d
658, 677 (Tex. App.—Fort Worth 2001, no pet.). 
At one end of the sliding scale are websites that are “clearly used for
transacting business over the Internet,” such as entering into contracts, and
the knowing and repeated transmission of files of information.  Dawson,
274 S.W.3d at 177.  These websites may be
sufficient to establish minimum contacts with a state.  Id.  On the other end of the scale are “passive”
or “informational” websites that are used only for purposes such as
advertising, and “are not sufficient to establish minimum contacts even though
they are accessible to residents of a particular state.”  Id.
at 178.  Between the extremes of the
scale are “interactive” websites that allow for the “exchange of information
between a potential customer and a host computer.”  Id.  We determine jurisdiction in situations
involving an interactive website by examining the degree of interaction between
the parties.  Id.; Karstetter v. Voss,
184 S.W.3d 396, 405 (Tex. App.—Dallas 2006, no pet.).

In Michel, the Fort Worth Court of Appeals determined that Rocket’s
website was “passive” because, although potential customers could contact
Rocket via an e-mail link on the website, Rocket could not directly respond
over the Internet to the potential customer. 
Michel, 45 S.W.3d at 678
(citing Mink v. AAAA Dev. LLC., 190
F.3d 333, 336 (5th Cir. 1999)).  Instead,
a Rocket sales representative would follow up with the potential customer using
the contact information that the customer provided in its e-mail.  Id.;
Mink, 190 F.3d at 337 (“There is no
evidence, however, that the website allows AAAA to do anything but reply to
e-mail initiated by website visitors.”); see
also Buchanan, 298 S.W.3d at 427 (holding that, although users could submit
employment applications, post comments, and subscribe to company’s “feed,” no
evidence existed that company could respond to applications, comments, or
inquiries through website, and therefore website was “too passive to establish systematic
and continuous contacts”).  In Jackson v. Hoffman, the Fourteenth Court
of Appeals addressed whether a website that provided a phone number, an e-mail
address, and a “contact form” constituted an additional contact to be
considered in determining jurisdiction.  Jackson, 312 S.W.3d 146, 154–55 (Tex.
App.—Houston [14th Dist.] 2010, no pet.). 
The court concluded that because there was no evidence regarding whether
the host computer could respond to users via the “contact form,” the website
was merely a “passive form of advertising” and the contact form and contact
information were not enough to move the website into the “interactive” category
on the sliding scale.  Id.

When asked in his deposition
whether he agreed that Waterman “actively solicits business” from its website,
Johnston disagreed and stated that Waterman posts information on its website,
and that potential customers could read that information and then contact
Waterman.  Johnston did not believe that
customers could contract with Waterman via its website, but, instead, customers
could click on a link on the website and send an e-mail to Waterman
representatives with any inquiries.  There
is no evidence regarding how Waterman responds to e-mail inquiries sent to it
through its website, such as whether it can respond through the website itself
or whether it must follow up via the customer’s personal contact information.

The evidence establishes that
Waterman’s website provides contact information, but does not allow potential
customers to book cargo through the website, or enter into contracts through
the website.  There is no evidence that
Waterman can respond to customer inquiries through the website.  See
Jackson, 312 S.W.3d at 154–55 (“Without [evidence of how the host computer
responds], we conclude appellee’s website is a passive form of advertising.”); Buchanan, 298 S.W.3d at 427.

We conclude that, like the websites
in Michel, Jackson, and Buchanan,
Waterman’s website is “passive advertising via the Internet and not a
purposeful activity directed toward [Texas] residents.”  Michel,
45 S.W.3d at 678; see also Jackson,
312 S.W.3d at 154–55; Buchanan, 298
S.W.3d at 427.  We therefore do not
consider Waterman’s website as an additional contact for determining whether
general jurisdiction exists.[11]

7.     Totality of Waterman’s Contacts

Although none of Waterman’s
contacts with Texas, standing alone, is sufficient to establish general
jurisdiction, when determining whether Waterman has sufficient minimum contacts
to support the exercise of personal jurisdiction, we must investigate, compile,
sort, and analyze all contacts “for proof of a pattern of continuing and
systematic activity.”  See Coleman, 83 S.W.3d at 809.  General jurisdiction requires “a showing of
‘substantial activities’ within the forum state, and those activities must
still be ‘purposefully’ directed into the forum state.”  Michel,
45 S.W.3d at 680 (quoting Bearry v. Beech
Aircraft Corp., 818 F.2d 370, 374 (5th Cir. 1987)).  We consider the nature and the quality of
Waterman’s contacts with Texas, not the “sheer number” of contacts.  Id.
(citing Guardian Royal, 815 S.W.2d at
230 n.1).

When determining whether a
defendant’s contacts rise to the level of “continuous and systematic” activity
necessary to support general jurisdiction, Texas courts often compare the
defendant’s contacts to those in Perkins
v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S. Ct. 413 (1952) and Helicopteros, which are on opposite ends
of the general jurisdiction spectrum.  See Coleman, 83 S.W.3d at 809.  In Perkins,
the president and general manager of the defendant company moved his office and
company files from the Philippines to Ohio during World War II.  342 U.S. at 448, 72 S. Ct. 413.  The president conducted all of the
corporation’s activities from Ohio, including holding director’s meetings,
depositing corporate funds into Ohio bank accounts, engaging in corporate
correspondence from his Ohio office, using an Ohio office to act as the
corporation’s transfer agent, and supervising the rehabilitation of Philippines
properties from Ohio.  Id. 
The Supreme Court concluded that Ohio could exercise general
jurisdiction over the corporation because it had, through its president, “been
carrying on in Ohio a continuous and systematic, but limited, part of its
general business.”  Id. at 438.

In contrast, in Helicopteros, the Supreme Court found
that Helicol did not have sufficient minimum contacts with Texas, even though
its president traveled to Texas and negotiated a contract for transportation in
Texas, purchased over $4,000,000 in helicopters and related equipment from
Texas vendors “at regular intervals,” and sent pilots and personnel to Texas
for training.  Helicopteros, 466 U.S. at 411, 104 S. Ct. at 1868.  Helicol was never authorized to do business
in Texas; it did not have a registered agent in Texas; it did not perform
helicopter operations in Texas, nor had any of its products ever reached Texas;
it did not solicit business in Texas; it did not have any employees based in
Texas; it never recruited employees from Texas; it did not own real or personal
property in Texas; it did not maintain an office in Texas; and it maintained no
records in Texas.  Id.  The Supreme Court
concluded that Helicol’s contacts with Texas did not “constitute the kind of
continuous and systematic general business contacts the Court found to exist in
Perkins.”  Id.
at 416, 104 S. Ct. at 1873.

When considering the totality of
Waterman’s contacts with Texas, we conclude that Waterman’s contacts are
similar to those of Helicol in Helicopteros.  Although Waterman has made eighteen port
calls in Texas, paid Texas vendors approximately $2,000,000 for goods and
services, paid franchise taxes, employed Texas residents as mariners through
the union hiring policies, and had vessels and barges repaired and inspected in
Texas, the majority of these contacts occurred because third-party
time-charterers or the federal government directed Waterman vessels to visit
Texas ports.  Although the quantity of
Waterman’s contacts with Texas may suggest that Waterman has a significant
relationship with Texas, when examining the quality of those contacts, it is
clear that Waterman’s connection with Texas is sporadic and largely
fortuitous.  See Coleman, 83 S.W.3d at 809–10. 
Waterman’s contacts do not demonstrate that it engages in “substantial
activities” that are purposefully directed to Texas.  Michel,
45 S.W.3d at 680.

Appellees, however, cite the Dallas
Court of Appeals’ decision in Siegmund
and the Fourteenth Court of Appeals’ decisions in Buchanan and Barker v.
Lescroart, No. 14-06-00125-CV, 2007 WL 445282 (Tex. App.—Houston [14th
Dist.] Feb. 13, 2007, no pet.) (mem. op.), in which the courts found that
general jurisdiction exists, for the proposition that Waterman has more
significant contacts with Texas than each of those three defendants.  We conclude that Siegmund, Buchanan, and Barker are distinguishable.

In Siegmund, Siegmund, one of PlaMetCo’s three employees, conducted
business for the company out of his home in Texas.  Siegmund,
309 S.W.3d at 707.  The Dallas Court of
Appeals observed that PlaMetCo’s business focused on providing “international
marketing and management services” to a company called Inppamet, and Siegmund,
the “Director International Business Development,” was the only employee
providing services to Inppamet.  Id. 
The Dallas Court concluded that, through Siegmund, PlaMetCo had an
“actual physical presence” in Texas, and the activities that Siegmund conducted
“continually and systematically” were of “such substantial nature and quality
as to justify suit against PlaMetCo in Texas.” 
Id. at 708.

Appellees argue that the result in Siegmund compels a finding of general
jurisdiction over Waterman because, while PlaMetCo only had Siegmund as a
resident employee, Waterman employs hundreds of Texas residents, had two Texas
residents on board the MAERSK ALABAMA, and appoints port agents to act on its
behalf during its Texas port calls.

Unlike in Siegmund, Waterman does not maintain any office in Texas, let alone
one that conducts a substantial part of its business.  Waterman’s employment of Texas mariners on
board its vessels is merely fortuitous and is the result of the unilateral acts
of third parties:  (1) those of the
national unions, who contact Texas union halls whenever a Waterman vessel needs
crewmembers and a Texas port happens to be the next destination and (2) those
of the mariners themselves who reside in Texas and respond to union hiring
calls.  Although Waterman appoints Texas
residents to act as port agents, these Texas residents are appointed as port
agents only because third-party time-charterers have made a decision to stop at
Texas ports.  Waterman’s special
appearance evidence reflects that Waterman vessels only sporadically stop in
Texas:  eighteen times over a period of
nearly seven years.

In Barker, Lescroart purchased a large amount of stock from Texas
residents, became a director of a Texas corporation, and agreed to provide
consulting services for a Texas corporation that required him to travel to
Texas to complete his contractual obligations.  Barker, 2007 WL 445282, at
*5.  The Fourteenth Court of Appeals held
that Lescroart “deliberately created continuing obligations between himself and
residents of Texas” and therefore “manifestly availed himself of the privilege
of conducting business here.”  Id.

By contrast, Waterman’s contracts
with Texas vendors to provide goods and services, including repairs and
inspections, during the jurisdictional period were limited to times when
Waterman vessels called upon Texas ports at the direction of third parties and
to “infrequent” contracts with the federal government to load food-aid cargo in
Texas.  These calls occurred sporadically
over the course of nearly seven years. 
Waterman did not enter into a “continuing” contractual obligation such
as Lescroart’s agreement to provide consulting services and sit on the board of
directors of a Texas corporation. 
Although Waterman entered into contracts with Texas vendors, mere
purchases standing alone, even if done at regular intervals, are not enough to
establish general jurisdiction in a cause of action not related to the purchase
transactions.  See Helicopteros, 466 U.S. at 418, 104 S. Ct. at 1874.

Appellees also cite to the
Fourteenth Court of Appeals’ decision in Buchanan,
in which the defendant was registered to do business in Texas, had a registered
agent in Texas, and had previously had an office in Texas.  298 S.W.3d at 419.  Although, as appellees note, Waterman has
employed Texas residents as port agents and as mariners, Waterman has never
registered to do business in Texas, it does not have a registered agent in
Texas, and it has never had an office in Texas. 
Buchanan, therefore, does not
support the exercise of general jurisdiction over Waterman.

We hold that Waterman’s special
appearance evidence does not establish that Waterman has “continuous and
systematic” contacts with Texas such that due process will allow Texas courts
to exercise general personal jurisdiction over it.

C.              
Maersk’s Contacts with Texas

In their third issue, appellees
contend that Maersk also has continuous and systematic contacts with Texas
sufficient to establish general personal jurisdiction.  Because a portion of Maersk’s contacts with
Texas are of the same nature, although in greater quantity, as the contacts
already discussed and analyzed for Waterman, we briefly discuss these contacts first.

1.     Maersk’s Contacts in Common with Waterman

Like Waterman, Maersk vessels call
upon Texas ports at the direction of third-party time-charterers.  In his deposition, Michael Hopkins, Maersk’s
general counsel and Senior Vice President of Contracts and Procurement,
testified that Maersk vessels made 612 calls upon Texas ports during the
jurisdictional discovery period of nearly seven years, generally calling upon
Texas ports twice a week.[12]  According to Hopkins, Maersk was under time
charter to its ultimate parent company, A.P. Moller Maersk (“APMM”), for the
“majority” of those calls, and APMM directed Maersk vessels to stop in
Houston.  The remainder of the port calls
were made at the direction of the federal government or other shippers.  To Hopkins’ knowledge, Maersk never made the
decision to stop at a Texas port, and Maersk vessels would not have called upon
Texas ports had they not been directed to do so by third parties.  Port calls, especially those made at the
direction of a third party, do not constitute sufficient contacts to establish,
by themselves, general jurisdiction.  Uche, 264 S.W.3d at 100; Farwah, 220 S.W.3d at 591–92.  However, here the majority of the port calls
were made under time-charter to Maersk’s own parent company, not an independent
third party.  Moreover, the evidence
establishes that over 600 calls were made by Maersk at such direction during
the jurisdictional period, generally on a routine two-week basis.

Maersk also entered into contracts
with Texas vendors for goods and services while its vessels were located in
Texas ports.  During the jurisdictional
discovery period, Maersk paid $145,066,543.53 to Texas vendors, including
payments for repairs and maintenance to Maersk vessels made while in Texas
ports.[13]  Purchases of goods and services, however,
even if occurring regularly, are insufficient by themselves to warrant the
exercise of personal jurisdiction over the nonresident defendant when the
purchases do not relate to the cause of action. 
See Helicopteros, 466 U.S. at
418, 104 S. Ct. at 1874; Reyes, 944
S.W.2d at 403, 404 (finding no general jurisdiction over defendant who
purchased more than $183,000,000 in goods from at least 471 Texas residents and
companies).

Maersk also employed 627 Texas
resident mariners.  Dennis Houghton,
Maersk’s Marine Personnel Director, testified that, to provide a crew for
Maersk vessels, Maersk uses the same procedure that Waterman does:  Maersk contacts the national union, which
then contacts the local union halls and allows mariners to bid on the job they
want.  The unions select the mariners,
and Maersk may reject a mariner only in limited circumstances.  Houghton also testified that, occasionally,
if a Maersk vessel is calling on a Texas port and it needs a crewmember
immediately, it contacts the local union hall directly before contacting the
national union office to give the local office a “heads up” that a crewmember
is needed.  According to Houghton, Maersk
contacted the local hall for this purpose “sporadically,” or about two or three
times per year.  The state of residency of
Maersk’s mariners is not a purposeful contact by Maersk directed toward Texas—Maersk does not control the states in which the
mariners reside, nor does it control who the national union selects to fill the
open position.  See Nath, 238 S.W.3d at 501; Buchanan,
298 S.W.3d at 416, 419 n.12. 
Furthermore, Maersk’s occasional direct contacting of a Texas union hall
to immediately replace a crewmember is fortuitous, and depends upon where the
vessel is located and the nearest port relative to the vessel’s location at the
time the need to replace the crewmember arises. 
We conclude that Maersk does not purposefully direct its hiring and
employment activities towards Texas residents. 
This does not constitute an act purposefully directed toward Texas.

Maersk also paid Texas franchise
taxes for 2003–2009.  Steve Hadder,
Maersk’s Vice President of Finance, testified in his deposition that Maersk’s
franchise tax liability is calculated by determining the number of days each
Maersk vessel is in a Texas port, divided by the number of days in the
year.  This amount is then multiplied by
the “chartering revenue” for the vessel, which equals the percentage of revenue
for that vessel apportioned to Texas. 
Maersk calculates this amount for each vessel and adds together the amounts
for all vessels that call upon Texas ports to equal its total franchise tax
liability for the year in Texas.  Maersk
paid $35,603.39 in Texas franchise taxes in 2006.  Although the record does not include Maersk’s
franchise tax returns for 2003–2005, Hadder testified that Maersk paid less
than $20,000 in Texas franchise taxes for each of these three years.[14]  Again, franchise tax liability, standing
alone, does not establish general jurisdiction. 
Asshauer, 228 S.W.3d at 933; Conner, 944 S.W.2d at 417–18.

During the jurisdictional discovery
period, from 2003 to 2009, seven Maersk employees traveled to Texas.  Dennis Houghton testified that he made four
or five trips to the Texas A&M Maritime School in Galveston to attend a
“career fair” and to familiarize cadets with Maersk.[15]  On one of these occasions, Houghton also
traveled to Houston to meet with the port agent of the Houston Seafarers’
International Union hall.  Kevin Speers,
Maersk’s Senior Director of Marketing and Administration, testified that he
traveled to Houston with at least three other Maersk employees for a business
meeting with APMM, in which the company representatives discussed how to
improve its services to the United States military.  Michael Hopkins testified that he also
traveled to Houston once on Maersk business, for an “industry meeting called by
the federal government.”  Occasional
travel to Texas is, standing alone, insufficient to establish general
jurisdiction.  Uche, 264 S.W.3d at 99. 
Moreover, the Maersk employees traveling to Texas did not choose the
locations of the meetings and events that they were attending, which reduces
the significance of the contacts.  See Coleman, 83 S.W.3d at 809 (holding
that five trips to Texas to attend national conferences did not support general
jurisdiction when defendant did not select location of conferences); Reyes, 944 S.W.2d at 404 (holding same
for 204 trips to Texas for inspections and reviews required by federal
contractual obligations).

2.     Maersk’s Website

Appellees contend that Maersk
maintains an interactive website which has a feature for prospective Maersk
employees, allows “eSuppliers” and vendors to log in and do business with
Maersk, and, through links to APMM’s website, advertises Maersk vessels
regularly calling on Houston.

Kevin Speers testified that a
section of Maersk’s website is devoted to prospective employees, and, for
mariners, the website informs the potential employee that to become a
crewmember on a Maersk vessel he must first become a member of a union.  The website provides links to the unions with
which Maersk contracts.  Speers also
testified that Maersk’s website is “informational,” and it directs potential
customers to other websites within the APMM family of companies, where they can
transact business and purchase services. 
Potential customers cannot enter into contracts with Maersk through
Maersk’s website, although Speers acknowledged that Maersk’s website links to
APMM’s, where the customers can find out more information regarding shipping
with Maersk.  Speers also stated that
interested customers have to visit APMM’s website to find information regarding
Maersk’s vessel schedules, as that information is not located on Maersk’s
website.

During his deposition, Speers also
discussed a section of the Maersk website for “eSuppliers” and vendors.  This section allows suppliers and vendors of
Maersk, not customers, to register and log in to access information.  The eSupplier page includes the following
statement:  “This portal has been
designed to serve our suppliers by providing a centralized location for
information that will assist you in conducting business with us.”  Speers testified that this section of the
website is only for “previously registered” suppliers and vendors selling goods
or services to Maersk and does not pertain to Maersk’s selling its
transportation services to customers. 
The record does not contain any evidence regarding the contents of the
eSupplier portal, the types of information that suppliers and Maersk can
exchange within this portal, or the methods by which suppliers and Maersk can
exchange information through the website. 
The record also does not contain evidence regarding whether suppliers
and vendors can enter into contracts with Maersk over its website, although
Speers’ statement that the eSupplier portal is for “previously registered”
suppliers suggests that this section of the website is for suppliers and
vendors that have a pre-existing relationship with Maersk and that the website
does not provide a means for companies seeking to become suppliers to enter
into a contractual relationship with Maersk. 
Maersk customers cannot book cargo through the website, and the site, in
Speers’ opinion, “has been and continues to be an informational website.”

Internet usage is characterized
along a sliding scale.  Dawson, 274 S.W.3d at 177.  We classify a website as “interactive” for
the purpose of transactions of goods or services if it allows for the exchange
of information between potential customers and the host.  Id.
at 178.  Although the evidence reflects
that customers seeking to use Maersk vessels to ship cargo cannot enter into
contracts with Maersk through its website and there is no indication that
suppliers and vendors can initially enter into contracts with Maersk through
its website, the website does allow registered suppliers and vendors to log
into a special section of the website to “assist [the suppliers] in conducting
business with [Maersk.]”  We conclude
that Maersk’s website is interactive.  See Daimler-Benz Aktiengesellschaft v. Olson,
21 S.W.3d 707, 724–25 (Tex. App.—Austin 2000, pet. dism’d w.o.j.) (classifying
website as “interactive” where site allowed users to submit comments and
questions and allowed users to sign up for electronic mailing service but
referred vehicle sales to parent company). 
Although this level of interactivity is, standing alone, not enough to
subject Maersk to jurisdiction in Texas, we consider it as a factor, along with
Maersk’s other Texas contacts.  Id.; Dawson,
274 S.W.3d at 178.

3.    
Registered to do Business,
Registered Agent, and Permanent Employee in Texas

 

Maersk concedes that it is
registered to do business in Texas and maintains a registered agent for service
of process in Texas; however, it contends that these contacts are not
sufficient to support general jurisdiction.

When a foreign corporation
registers to do business in Texas, it “only potentially subjects itself to
jurisdiction” in Texas.  Conner, 944 S.W.2d at 416.  Although we consider registering to do
business in Texas and maintaining a registered agent in Texas in undertaking a
minimum contacts analysis, these factors are not dispositive of whether Texas
courts can constitutionally exercise general jurisdiction.  See
Buchanan, 298 S.W.3d at 419.

Maersk also concedes that it has a
full-time employee in Houston, who works out of his home, uses an “unlisted
company cellphone for his job duties,” and acts as a port agent whenever Maersk
vessels call at Texas ports.  Maersk
provides health benefits to this employee and this employee is covered under
Maersk’s workers’ compensation insurance. 
In his affidavit supporting Maersk’s special appearance, Hopkins averred
that Maersk “does not solicit business in Texas through this single employee
and [Maersk] does not hold itself out as being open for general business in
Texas through this single employee.” 
This employee’s duties are limited to “interface[ing] between the vessel
and the shoreside support.”

Having an office or a physical
presence in the forum state “does not require a finding of general jurisdiction.”  Alenia
Spazio, S.P.A. v. Reid, 130 S.W.3d 201, 217 (Tex. App.—Houston [14th Dist.]
2003, pet. denied).  The significance of
the contact “depends on the type and nature of the office maintained.”  Id.  For example, if the office is a permanent
general business office through which the company solicits business in Texas,
this factor weighs strongly in favor of general jurisdiction.  Id.;
see also Siegmund, 309 S.W.3d at
707–08 (finding general jurisdiction when one Texas employee used home as “base
of operations” for conducting substantial business for company).

Maersk does not maintain a “general
business office” in Texas, but instead employs one employee whose duties are
limited to acting as a port agent when a Maersk vessel calls upon a Texas
port.  This employee conducts Maersk’s
business in Texas.  Although the
continuous presence of an employee in Texas is a factor we consider, that
factor alone does not support a finding of general jurisdiction.  See
Siegmund, 309 S.W.3d at 707–08; Alenia
Spazio, 130 S.W.3d at 217.

4.     Solicitation of Employees at A&M Career
Fair

Dennis Houghton, Maersk’s Marine
Personnel Director, testified that he traveled to Texas four or five times to
attend a career fair at the Texas A&M Maritime School in Galveston during
the jurisdictional period.  At this fair,
he presented information about Maersk to interested cadets and “familiarized”
them with the company and “the unions that they have to join to be able to sail
on [Maersk’s] vessels.”  He stated that,
although he accepts resumes from the cadets if they give him one and answers
e-mail inquiries about working for Maersk, he does not follow up with the
cadets about future employment with Maersk. 
Houghton acknowledged that, occasionally, a cadet he spoke to at A&M
could later be employed on a Maersk vessel, although Houghton emphasized that
Maersk would have had nothing to do with that placement and that a former
A&M cadet may work on Maersk vessels only if the cadet bids on the job and
the union selects him for the position. 
Houghton also testified that A&M cadets can work on Maersk vessels
while still in maritime school under the federal Maritime Subsidy Program.  Houghton stated that accepting cadets onto
Maersk ships is required under the program and that Maersk cannot pick students
from a particular school to gain experience on its vessels through the program.

Maersk contends that when Houghton
visited the career fair, the purpose of the visit “was not to solicit and hire
cadets to work” for Maersk, but was to “familiarize the cadets at the Maritime
School with [Maersk] and provide information to the cadets.”  We disagree with Maersk’s contention that it
did not solicit future employees at the career fairs.  Although Maersk correctly notes that,
pursuant to union protocols, it could not directly hire an interested cadet at
the career fair for an immediate position on a vessel, the purpose of
Houghton’s visits was to inform the cadets of the benefits of working on Maersk
vessels so that, in the future, they would be more likely to bid on open
mariner positions on Maersk vessels.  The
A&M career fair is held yearly, and Houghton agreed that he attended the
fair “four or five times in the last four or five years.”  Houghton’s visits to the A&M career fair
are a regularly conducted activity that specifically targets Texas
residents.  See Buchanan, 298 S.W.3d
at 427 (holding website not interactive because, although it invites
prospective employees to submit applications, Texas residents were not
“targeted for recruitment”).  His visits
to the career fair to solicit and recruit future employees for Maersk may be
considered as a factor that supports jurisdiction.

5.     Texas Bank Accounts

Appellees contend that Maersk
deposited approximately $227,000,000 into the Dallas bank account of its
immediate parent company, Maersk, Inc., and maintained eight separate Bank of
America accounts in San Antonio for specific Maersk vessels.

Whether a defendant possesses a
bank account in Texas is a factor that we consider when determining whether the
defendant is subject to general jurisdiction. 
See El Puerto de Liverpool, S.A. de
C.V. v. Servi Mundo Llantero S.A. de C.V., 82 S.W.3d 622, 631 (Tex.
App.—Corpus Christi 2002, pet. dism’d w.o.j.) (citing CSR, 925 S.W.2d at 595); Transportacion
Especial Autorizada, S.A. de C.V. v. Seguros Comercial Am., S.A. de C.V.,
978 S.W.2d 716, 720 (Tex. App.—Austin 1998, no pet.).  In determining jurisdiction, we focus on the
quality and nature of the defendant’s contacts with Texas, and, therefore, use
of the bank account “must be continuous and systematic in order to support the
exercise of general jurisdiction.”  El Puerto, 82 S.W.3d at 631; Falcon, 5 S.W.3d at 720 (“The infrequent
use of the Laredo National Bank account to assist in the sporadic purchases is
similarly unavailing.”).  The total
number of funds in the account and the number of transactions involving the
account are not, by themselves, determinative of jurisdiction.  El
Puerto, 82 S.W.3d at 631 (citing Primera
Vista v. Banca Serfin, 974 S.W.2d 918, 926 (Tex. App.—El Paso 1998, no
pet.)).  Mere “pass-through” accounts,
“where the account merely serves as a conduit for funds in transit, will not by
itself result in general jurisdiction.”  Id.

Here, Maersk contends that it
loaned approximately $227,000,000 in excess operating funds to Maersk, Inc.,
its New Jersey parent company, as part of a “cash management” program set up by
Maersk, Inc. for its subsidiary companies and that Bank of America processed
the loans through its Dallas branch. 
Steve Hadder testified that Maersk does not intend to do business with a
bank located in Texas, and if funds intended for Maersk’s parent company passed
through a Texas branch, “[t]hat’s simply a Bank of America structure.”  Hadder stated that Maersk has never directed any
bank to open an account in Texas, but he was not sure if Maersk, Inc. owned any
bank accounts in Texas.  The record is
unclear regarding whether this account was located in Texas or whether the
account was located in New Jersey and Bank of America merely processed the
funds through its Dallas branch. 
Regardless, it is undisputed that these deposits were made into an
account owned by Maersk, Inc., the parent company, and not Maersk Line, Limited,
the defendant in this case.

Even if the account is located in
Texas, appellees make no argument and cite no authority for the proposition
that this account owned by the parent company should be a Texas contact imputed
to the subsidiary company.  See Helicopteros, 466 U.S. at 416–17,
104 S. Ct. at 1873 (noting that Helicol’s acceptance of check drawn on Texas
bank was not purposeful because choice of bank was within discretion of drawer,
not payee); Moni Pulo Ltd. v. Trutec Oil
& Gas, Inc., 130 S.W.3d 170, 177–78 (Tex. App.—Houston [14th Dist.]
2003, pet. denied) (holding Texas bank accounts not sufficient to establish
general jurisdiction when defendant, although beneficiary of accounts, had no
control over accounts or their location); Preussag
Aktiengesellschaft v. Coleman, 16 S.W.3d 110, 124 (Tex. App.—Houston [1st
Dist.] 2000, pet. dism’d w.o.j) (“The fact that Preussag AG deposits its funds
under this system in some subsidiaries’ Texas bank accounts is a fortuitous
contact, since the ‘banking’ system is not itself directed toward Texas.”); see also Conner, 944 S.W.2d at 419 (“If
parent and subsidiary maintain separate and distinct corporate entities, the
presence of one corporation in a forum state may not be attributed to the
other.”).

In its “Second Supplemental
Memorandum” supporting its special appearance, Maersk agreed that it opened
eight “vessel specific” bank accounts with Bank of America to “receive payments
for military vessel operations,” but it asserted that Bank of America
unilaterally decided to process the accounts through the Military Bank Overseas
Division located in San Antonio and that Maersk did not purposefully choose to
open the accounts in Texas.  In its
briefing to this Court, Maersk acknowledges that the eight accounts were
located in Texas but contends that these accounts “were temporary and have been
closed.”  Aside from the brief mention of
these accounts in Maersk’s Second Supplemental Memorandum, the record contains
no evidence regarding these accounts, such as the amount of funds contained in
the accounts or the number and frequency of transactions involving the
accounts.

In assessing a defendant’s minimum
contacts when the defendant possesses a bank account in Texas, we focus on the
quality of the defendant’s use of the account, whether the defendant
purposefully availed itself of the privileges and benefits of conducting
business in Texas, and whether the defendant’s use of the account constituted
“substantial activities” in Texas.  El Puerto, 82 S.W.3d at 632.  In El
Puerto, two corporate officers testified that the company’s Texas bank
account was used “for the purpose of the company’s business” and “to provide
dollars for the company’s operating needs.” 
Id.  The record reflected that El Puerto used the
account continuously for a five year period and completed “numerous and
repeated” transactions involving the account. 
Id. at 633.  Testimony also indicated that El Puerto
specifically chose to open the account in Texas and that El Puerto used the
account to “directly facilitate its own business” and for “substantive
transactions.”  Id.  The Corpus Christi Court
of Appeals concluded that El Puerto conducted substantial activities in Texas
through its bank account.  Id.

Here, in contrast, the record
contains no evidence regarding the amount of funds placed in these eight
accounts, the number of transactions involving the accounts, or how Maersk used
the accounts.  Based on this record, we
cannot conclude that Maersk used the accounts continuously and systematically
and conducted “substantial activities” in Texas through the accounts.  We therefore consider these accounts as a
factor weighing in favor of jurisdiction, but we note that the accounts alone
are not sufficient to establish general jurisdiction.  Id.

6.     Payments Received from Texas Entities

Maersk received approximately
$7,500,000 from Azure Shipping Company, S.A., a Panamanian company, to ship
three loads of cargo from Georgia to Angola. 
Azure’s agent, American Shipping & Chartering (“ASC”), is a Texas
company.  Hopkins, Maersk’s general
counsel, testified that Maersk picked up the cargo in Georgia, no Maersk
employee traveled to Texas to enter into the contract, and Maersk did not
receive payment from ASC, the Texas agent. 
Maersk also received an additional payment of approximately $160,000
from ASC on behalf of Azure for another shipment of goods.  Because Maersk had no control over the
citizenship of Azure’s agent, we conclude that the only connection to Texas in
these transactions is too remote and fortuitous to support the exercise of
general jurisdiction.

Maersk also sold $530,000 worth of
“excess consumables” located on six different Maersk vessels to Ocean
Shipholdings, Inc., a Texas company. 
Hadder testified that Maersk had a contract with Military Sealift
Command, and, at the end of that contract, Maersk sold the non-government-owned
excess property and equipment on the ship to the next operator, which was a
Texas company.  Hadder stated that the $530,000
Maersk received “[was] not considered revenue for accounting purposes.”

Isolated sales to Texas residents
do not constitute purposeful availment of the benefits and protection of Texas
laws.  Therefore, this sale does not
invoke general jurisdiction.  Reyes, 944 S.W.2d at 405.

 

 

7.     Contract with Telemar

Maersk contracted with Telemar USA,
LLC, a Texas company, to provide maintenance and repair services for
telecommunications, radio, and navigation systems on Maersk ships throughout
the world, with no restrictions on the ports in which Telemar is to provide its
services.  Appellees contend that Maersk
contractually reserved the right to sue in Texas courts pursuant to the
following clause in the contract with Telemar:

This Agreement shall be
governed by and construed in accordance with the laws of the State of
Virginia.  The parties submit to the
exclusive jurisdiction of the courts of Virginia, provided that the OWNER
[Maersk] but not the Company shall also be entitled to commence proceedings in
relation to this agreement in the courts of such other jurisdiction where the
vessel or any item to which this Agreement relates may be.

 

This clause provided for use of Virginia law in
construing the contract and the parties agreed to submit to jurisdiction in Virginia.  However, Maersk retained the right to sue in
the courts of the jurisdiction in which the vessel or any other item covered
under the contract was located, which could be Texas.

          Maersk
has not sued Telemar on this contract, and, even if it had, voluntarily filing
suit in a particular jurisdiction is purposeful availment of the jurisdiction’s
facilities and can subject the party to personal jurisdiction in another
lawsuit “only when the lawsuits arise from the same general transaction.”  Zamarron
v. Shinko Wire Co., 125 S.W.3d 132, 143 (Tex. App.—Houston [14th Dist.]
2003, pet. denied).  Although Maersk
retained the right to sue Telemar in Texas when its vessels or any item related
to its contract with Telemar were in Texas, this reservation of rights in a
contract with a Texas company for the provision of services does not establish
general jurisdiction in this case.  The
Telemar contract bears no relation to the facts of this lawsuit and is not part
of the “same general transaction.”  See id.

8.     Previous Lawsuits in Texas

          Michael
Hopkins testified that, during his tenure with the company, Maersk had been
sued twice in Texas before this case.[16]  Hopkins testified that Maersk did not
challenge personal jurisdiction in these previous lawsuits.

          The
failure of a defendant to challenge personal jurisdiction in a case in which a
Texas court apparently would be able to exercise specific jurisdiction “does
not demonstrate that a nonresident defendant has the continuous and systematic
contacts with Texas necessary for the exercise of general jurisdiction.”  Buchanan,
298 S.W.3d at 414 (citing Nath, 238
S.W.3d at 501).  The previous lawsuits
against Maersk, which involved allegations that Maersk failed to pay for
services rendered, could have been subject to specific jurisdiction, in which
case, Maersk’s failure to specially appear in those case does not establish
that Maersk has the continuous and systematic contacts with Texas necessary to
establish general jurisdiction in this case. 
See id.

9.     Advertising Texas Port Calls

At the special appearance hearing,
the trial court admitted printouts from Maersk’s website depicting a
“historical list of its routes.”[17]  This exhibit consists of Maersk’s “North
American Service Guide,” dated 2009, which describes the services that Maersk
offers to five general areas of the world: 
Africa, Central America, the Mediterranean, the Middle East and the
Indian Subcontinent, and Northern Europe. 
According to the Service Guide, ten routes from East and West Africa
stop in Houston, ten routes total from the Mediterranean, Middle East, and
Indian Subcontinent stop in Houston, four routes from Central America stop in
Houston, and three routes from Northern Europe stop in Houston.

The Service Guide informs potential
customers seeking to ship to and from Central America that Maersk’s service
portfolio provides “a wide number of options with direct departures to the U.S.
East, West and Gulf Coasts.”  The Guide
states that Maersk’s “Expreso” service has “a fast transit time to Houston from
Central American ports” and that the service “continues direct calls to New
Orleans and Houston” catering to Central American origins.  Similarly, the guide promises that “[d]irect,
reliable service, and best-in-industry transit times are available from Italy
and Spain to all major U.S. East Coast ports and Houston” and states that
“MECL2 offers dedicated mother vessel service from Port Said westbound to the
U.S. East Coast and Houston.”  The
Service Guide also advertises “[w]eekly U.S. Flag service on the TA2 with new,
faster vessels [that] provides a dedicated service from Northern Europe to
Charleston, Houston and now Mobile.” 
Kevin Speers, Maersk’s Marketing Director, testified that, at trade
shows, Maersk representatives talk about the foreign and domestic ports that
they can serve, including Houston, that Maersk’s marketing materials include
vessel routes and maps of port calls, and that the materials advertise that Maersk’s
vessels call on Houston.  Cf. Conner, 944 S.W.2d at 417 (“Texas is
never the original destination of
ContiCarriers’ barges, and barge loads only go to Texas upon customer request.  ContiCarriers has never made a conscious
effort to secure freight to go to Texas, and often refuses customer requests to
take barges to Texas because it does not ‘do business’ in the state and has
nothing to back-haul.”) (emphasis in original).

At the special appearance hearing,
the trial court also admitted, without objection, a copy of Maersk’s Twitter
feed, dating from June 5, 2009, which provides information on Maersk’s
Breakbulk Vessel Schedule.  Maersk
provides regular updates for the “estimated time of arrival” for six different
Maersk vessels at various ports.  Almost
all of the updates include “ETAs” for the Port of Houston.  Maersk also uses its Twitter feed to promote
the capabilities of its vessels, such as by stating that the “Maersk
Constellation is a geared multi-purpose vessel offering 30,000 square feet of
Ro/Ro capability[,] LOA 182m, DWT 29750mt, bale 35489cbm.”  On two occasions before the jurisdictional
discovery cut-off of October 6, 2009, Maersk used its Twitter feed to solicit
additional cargo for its voyages.  On
June 16, 2009, Maersk posted that it was “soliciting US flag and [commercial]
cargo [loading] on the U.S. East Coast (USEC) and U.S. Gulf (USG) for
[discharge in] Northern Europe, [Mediterranean,] and Black Sea.”  Maersk posted a similar message on June 30,
2009, seeking flag or commercial cargo for discharge in the Mediterranean, Red
Sea, Black Sea, or East Africa, departing from ports on the East and Gulf
Coasts.

This evidence indicates that
Houston is a “regular” port for Maersk and is part of its established service
routes.  Maersk advertises that it calls
on Houston on a regular basis, praises its “best-in-industry transit times” to
United States ports, including Houston, and solicits additional cargo via
Twitter when its vessels located in Gulf of Mexico ports, including Houston,
have extra storage space.

 

10.           
Totality of
Maersk’s Contacts with Texas

Even if a defendant’s contacts with
Texas, when considered in isolation, may not be sufficient to establish
personal jurisdiction, we consider all contacts together when determining if
the defendant has sufficient minimum contacts to support general jurisdiction.  Coleman,
83 S.W.3d at 809.  Although Maersk has
several categories of contacts in common with Waterman, such as employing Texas
residents as mariners through the national unions and paying Texas vendors when
its ships call upon Texas ports, Maersk has numerous additional contacts that,
when considered together, indicate that Maersk is engaged in substantial
activities purposefully directed to Texas. 
Michel, 45 S.W.3d at 680.

Maersk is registered to do business
in Texas, it maintains a registered agent for service of process in Texas, and
it has a full-time employee in Houston to act as a port agent when Maersk
vessels call upon the Port of Houston. 
Although this employee’s activities do not constitute a significant
portion of Maersk’s overall business, the fact that Maersk retains an employee
on a full-time basis to handle its vessels calling on Houston, as opposed to
hiring an agent on an ad hoc basis like Waterman, reflects the frequency with
which Maersk vessels call on Texas ports and suggests that Maersk derives enough
business from its voyages to Texas to justify this position.  Furthermore, Maersk advertises, through the
North American Service Guide available on its website, its marketing materials
and trade show publications, and its Twitter feed, that its vessels regularly
call on the Port of Houston and that Houston is a stop on numerous established
service routes.  Maersk vessels
frequently visit Texas and Maersk holds itself out as calling on Houston on a
regular basis.  Maersk also, on at least
two occasions during the relevant period, solicited additional cargo for its
vessels, to load in ports on the East and Gulf coasts of the United
States.  Maersk does business with Texas
entities, pays Texas franchise taxes, maintained eight bank accounts in Texas,
has an interactive website, solicits future employees at the Texas A&M
career fair, and has, on one occasion, contractually reserved the right to sue
a Texas company in Texas.

When we consider the totality of
Maersk’s contacts with Texas, we conclude that Maersk has purposefully availed
itself of the benefits and protections of Texas laws and has established
sufficient minimum contacts with Texas to support the exercise of general
jurisdiction.

Fair Play and Substantial Justice

          Having
determined that Maersk purposefully established minimum contacts with Texas, we
must now determine whether the exercise of personal jurisdiction over it
comports with traditional notions of fair play and substantial justice.  See
Glattly, 177 S.W.3d at 447 (citing Burger
King, 471 U.S. at 475–76, 105 S. Ct. at 2183–84).  When making this inquiry, we consider:  (1) the burden on the defendant; (2) the
interests of the forum state in adjudicating the dispute; (3) the plaintiff’s
interest in obtaining convenient and effective relief; (4) the interstate
judicial system’s interest in obtaining the most efficient resolution of
controversies; and (5) the shared interest of the several states in furthering
fundamental, substantive social policies. 
Guardian Royal, 815 S.W.2d at
231.  Only in rare cases will the
exercise of jurisdiction not comport with fair play and substantial justice
when the nonresident defendant has purposefully established minimum contacts
with the forum state.  Spir Star AG v. Kimich, 310 S.W.3d 868,
878 (Tex. 2010).  To defeat jurisdiction,
Maersk must present “a compelling case that the presence of some consideration
would render jurisdiction unreasonable.” 
Id. (quoting Guardian Royal, 815 S.W.2d at 231).

          When
a Texas resident pursues a cause of action for harm committed within Texas,
“the fairness considerations have little impact.”  Michel,
45 S.W.3d at 683.  When, however, the
cause of action is not connected to Texas and none of the parties are Texas
residents, “fairness becomes of paramount importance.”  Id.
(citing Jones v. J.P. Sauer & Sohn,
27 S.W.3d 157, 161 (Tex. App.—San Antonio 2000, pet. denied)).

          Maersk
contends that the burden on it to defend the case in Texas would be great
because Maersk has no office in Texas, but is instead headquartered in Virginia,
and a trial with ten plaintiffs and intervenors would be lengthy and would
“consum[e] enormous resources.”  Distance
alone is insufficient to defeat jurisdiction, because “[m]odern transportation
and communication make it much less burdensome for a party to defend itself in
a state where it does business.”  Spir Star, 310 S.W.3d at 879; State of Rio de Janeiro v. Philip Morris,
Inc., 143 S.W.3d 497, 502 (Tex. App.—Beaumont 2004, pet. denied).  Maersk’s contacts with Texas lessen the
burden of defending the lawsuit.  Philip Morris, 143 S.W.3d at 502 (citing
Olson, 21 S.W.3d at 726).

The record indicates that Maersk
employees have traveled to Texas before, that Maersk admits it has participated
in lawsuits in Texas on previous occasions, and that Maersk contractually
reserved the right to sue in Texas for matters relating to its contract with
Telemar.  See Buchanan, 298 S.W.3d at 420 (“The record instead demonstrates
that Antero employees already travel to Texas for business meetings, and Antero
has been represented by Texas attorneys throughout its existence, both in this
litigation and for corporate legal advice.”); see also Villagomez v. Rockwood Specialties, Inc., 210 S.W.3d 720,
743 (Tex. App.—Corpus Christi 2006, pet. denied) (“As a national corporation
with ongoing and pervasive contacts with Texas, Rockwood is especially well
suited for this type of out-of-state litigation.”).  Furthermore, unlike Rocket Engineering in Michel, Maersk is not a “small
enterprise.”  See Michel, 45 S.W.3d at 683–84. 
The burden on Maersk of defending this lawsuit in Texas is minimal and
does not, by itself, preclude the exercise of jurisdiction.  Philip
Morris, 143 S.W.3d at 502.

          Maersk
contends that the remaining factors weigh against exercising personal jurisdiction
in Texas because Texas has no connection to this lawsuit:  the underlying incident occurred off the
coast of Somalia, none of the plaintiffs reside in Texas so Texas has no
interest in obtaining redress for its citizens, Maersk is a Delaware corporation
with its principal place of business in Virginia, Maersk’s employees and
representatives all reside in Virginia, none of the witnesses reside in Texas,
none of the relevant evidence exists in Texas, and Texas has no property
interest at stake in this litigation.  Id.; James
v. Ill. Cent. R.R. Co., 965 S.W.2d 594, 599 (Tex. App.—Houston [1st Dist.]
1998, no pet.) (“The cause of action did not occur in Texas, and neither party
is a resident of this state.”).

Generally, Texas has no interest in
adjudicating a case between nonresidents concerning occurrences that took place
outside of Texas.  Moni Pulo, 130 S.W.3d at 180 (holding, in dicta, that exercising
personal jurisdiction violated traditional notions of fair play and substantial
justice).  In James, we held that, although Illinois Central had sufficient
minimum contacts with Texas, Texas had no interest in adjudicating the
particular dispute.  James, 965 S.W.2d at 599. 
The underlying suit was for personal injuries suffered by James as he
worked as a switchman for Illinois Central in Tennessee.  Id.
at 596.  Illinois Central’s “only conduct
in Texas” involved its employment of an accounts manager as a full-time
employee in Houston.  Id. at 598, 599 n.3.  We concluded that Texas’s interest in
adjudicating the dispute was “further diminished because James’s injury has no
relation to Illinois Central’s activities in Texas.”  Id.
at 599.  In that case, by exercising
personal jurisdiction, Texas “would not be protecting its citizens from the
potential future actions of Illinois Central.” 
Id.; see also Verizon Cal. Inc. v. Douglas, No. 01-05-00707-CV, 2006 WL
490888, at *7 (Tex. App.—Houston [1st Dist.] Mar. 2, 2006, no pet.) (mem. op.)
(“The parties are California residents; thus, Texas has no interest either in
protecting its citizens or in policing the activities of a corporation
authorized to do business in the state.”).

          Here,
although none of the current parties to this litigation are residents of Texas,
two of the crewmembers on board the MAERSK ALABAMA were Texas residents, and
Maersk has employed over 600 Texas resident mariners throughout the past eight
years.  In the underlying lawsuit, the
appellees allege that Maersk was negligent and grossly negligent by providing
inadequate security and safety for the crewmembers and that Maersk knowingly
sent its vessels into unsafe waters. 
This case directly implicates Maersk’s safety practices, which would
affect the Texas mariners sailing on Maersk vessels.  Thus, unlike in James, by exercising jurisdiction over Maersk here, Texas could
“protect its citizens from the potential future actions” of Maersk.

          The
third factor to consider is the plaintiff’s interest in obtaining convenient
and effective relief.  Although none of
the plaintiffs and intervenors are Texas residents, they chose Texas as their
forum.  In this situation, “we can
presume they do not find [litigating in Texas to be] inconvenient or
ineffective.”  E.I. DuPont de Nemours & Co. v. Bailey, 986 S.W.2d 82, 84–85
(Tex. App.—Beaumont 1999, pet. dism’d w.o.j.); Solow v. Century Assets Corp., 12 S.W.3d 512, 517 (Tex.
App.—Beaumont 1999, no pet.) (“Destefano chose Texas as his forum; we cannot
presume he finds it inconvenient or ineffective.”); see also Glencoe Capital Partners II, LP v. Gernsbacher, 269 S.W.3d
157, 168 (Tex. App.—Fort Worth 2008, no pet.) (“[B]ecause Appellants hail from
several different states, there will be some degree of inconvenience on at
least some of them regardless of where litigation proceeds.”).  It may, as Maersk contends, be “more
convenient” for the plaintiffs to litigate in a different forum, such as one in
which the majority of parties reside; however, whether a particular forum is
more or less convenient is a question for a forum non conveniens case, not a
special appearance.  Bailey, 986 S.W.2d at 85. 
Merely because it might be most efficient to litigate where the majority
of witnesses and evidence is likely to be located does not establish that it
would be inefficient to litigate in Texas. 
See id. (“Further, as noted in
our discussion under the burdensome factor, the record contains no evidence of
where the witnesses are located.”). 
Although Maersk’s corporate representatives and employees reside in
Virginia and the appellees reside in New York, Pennsylvania, and Florida, the
record contains no evidence of where other witnesses, such as appellees’
medical experts, reside.

          When
considering the interstate judicial system’s interest in obtaining the most
efficient resolution of the controversy as well as the “shared interest of the
several states” in furthering fundamental social policies, we must weigh the
interests of Texas, Virginia, New York, Pennsylvania, and Florida.  Michel,
45 S.W.3d at 684.  Virginia, as the “home
state” of Maersk, arguably has the greater interest in the substantive social
policies relating to the conduct of one of its residents.  See id.;
Philip Morris, 143 S.W.3d at 503
(holding that state in which defendant has principal place of business has
direct interest in substantive law relating to dispute and strong interest in
governing conduct of its residents). 
This factor, therefore, weighs in favor of not exercising jurisdiction
in Texas.

          Decisions
that necessitate piecemeal litigation “result in inefficiency.”  Capital
Tech. Info. Servs., Inc. v. Arias & Arias Consultores, 270 S.W.3d 741,
752 (Tex. App.—Dallas 2008, pet. denied). 
We have already held that Waterman, an Alabama corporation with its
principal place of business also in Alabama, lacks the sufficient contacts
necessary for Texas to exercise personal jurisdiction.  Maersk contends that Virginia is the most
appropriate forum to litigate this dispute. 
There is no evidence that Waterman has sufficient contacts for Virginia
to exercise jurisdiction, there is no evidence that Maersk has sufficient
contacts for Alabama to exercise jurisdiction, and there is no evidence that
either Waterman or Maersk has sufficient contacts for the other states whose
residents are involved—New York,
Florida, and Pennsylvania—to exercise
jurisdiction.  There is no evidence that
any particular state can exercise personal jurisdiction over both
defendants.  Piecemeal litigation,
therefore, may be unavoidable in this case.

          When
we consider all of the factors, we conclude that Maersk has failed to present a
compelling case that the exercise of personal jurisdiction over it in Texas
would violate traditional notions of fair play and substantial justice.  We therefore hold that the trial court
correctly denied Maersk’s special appearance.

Failure to File Findings of Fact and Conclusions of Law

          Finally,
in their fifth issue, Waterman and Maersk contend that the trial court erred in
failing to file findings of fact and conclusions of law after they timely
requested such findings and conclusions.

          A
trial court may, but is not required to, file findings of fact and conclusions
of law after it enters an interlocutory order such as an order denying a
special appearance.  Tex. R. App. P. 28.1(c); Blair Commc’ns, Inc. v. SES Survey Equip.
Servs., Inc., 80 S.W.3d 723, 725 (Tex. App.—Houston [1st Dist.] 2002, no
pet.).  Texas Rules of Civil Procedure
296 and 297 generally govern the filing of findings of fact and conclusions of
law.  See
Tex. R. Civ. P. 296 (“In any case
tried in the district or county court without a jury, any party may request the
court to state in writing its findings of fact and conclusions of law.”); id. 297. 
Rule 296 gives “a party a right to findings of fact and conclusions of
law finally adjudicated after a
conventional trial on the merits before the court.”  IKB
Indus. (Nigeria) Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 442 (Tex. 1997)
(emphasis added).  In other cases,
findings and conclusions are “proper, but a party is not entitled to
them.”  Id.  Because Rules 296 and
297 do not “impose any duty on the trial court” to file findings and
conclusions when no trial takes place, such as in the case of special
appearances subject to interlocutory appeal, appellants demonstrate no
“intrinsic error” by the trial court’s failure to file findings and conclusions.  In re
Estate of Davis, 216 S.W.3d 537, 542 (Tex. App.—Texarkana 2007, pet.
denied) (quoting Niehaus v. Cedar Bridge,
Inc., 208 S.W.3d 575, 579 n.5 (Tex. App.—Austin 2006, no pet.)).

          Here,
after the trial court denied the special appearances, Waterman and Maersk
requested findings of fact and conclusions of law pursuant to Rules 296 and
297.  Because this is a special
appearance and there has not yet been a conventional trial on the merits,
Waterman and Maersk are not entitled to findings and conclusions.[18]  We therefore hold that the trial court did
not err in failing to file findings and conclusions.

Conclusion

          We
affirm the portion of the trial court’s order finding that it has personal
jurisdiction over Maersk.  We hold that
Waterman lacks sufficient minimum contacts to support general
jurisdiction.  We therefore reverse the
portion of the trial court’s order finding that it has personal jurisdiction
over Waterman and render judgment dismissing Waterman from the litigation.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Higley, and Bland.

 

 











[1]
          Salah and Clotter reside in New
York, Abdelwaham resides in Minnesota, Brzezinski resides in Massachusetts, and
Sanchez resides in Pennsylvania.  None of
these intervenors are parties to this appeal.

 





[2]
          Appellants filed identical
special appearances in response to Cronan’s and Hicks’s petitions in
intervention on December 30, 2009, and January 8, 2010, respectively.  It is undisputed that the special appearances
were the first instruments filed by Waterman and Maersk in the Ruiz case.





[3]
          In addition, a plaintiff’s
nonsuit “cannot extinguish a defendant’s courterclaim for costs and attorney’s
fees,” and a nonsuit “cannot be used to disturb a court’s judgment on the
merits of a claim, such as a partial summary judgment against the nonsuiting
party.”  Villafani v. Trejo, 251 S.W.3d 466, 469 (Tex. 2008); Hyundai Motor Co. v. Alvarado, 892
S.W.2d 853, 854–55 (Tex. 1995) (per curiam) (“A decision on the merits, such as
a summary judgment, however, is not vitiated.”); see also Le v. Kilpatrick, 112 S.W.3d 631, 634 (Tex. App.—Tyler
2003, no pet.) (holding that nonsuit vitiates order denying special appearance
because such order does not “reflect[] any judgment on the merits of the
case”).  Here, it is undisputed that
Waterman and Maersk did not assert any claims for affirmative relief or
counterclaims for costs and attorney’s fees in the Hicks case.  It is also undisputed that neither the state
nor the federal district court issued any rulings on the merits of the case
before Hicks nonsuited his claims.





[4]
          We note that Harris County Local
Rule 3.2.3(a) provides:  “Subject to
subpart c, a motion to consolidate cases must be heard in the court where the
first filed case is pending.  If the
motion is granted, the consolidated case will be given the number of the first
filed case and assigned to that court.”  Harris Cnty. (Tex.) Civ. Dist. Loc. R.
3.2.3(a).  Furthermore, “[a]ny matter
filed after a non-suit, dismissal for want of prosecution, or other disposition
of a previous filing involving substantially-related parties and claims shall
be assigned by the Administrative Judge of the Civil Trial Division to the
court where the prior matter was pending.” 
Id. 3.2.2.





[5]
          Cronan also cites the Texas Supreme Court’s
statement in Villafani that a nonsuit
“does not purport to limit the trial court’s power to act” for the proposition
that Rule 162 does not prohibit the trial court from exercising personal
jurisdiction over a defendant who had previously generally appeared in a
nonsuited case.  We note that this
statement was made in the context of determining whether a trial court can act
on a sanctions motion after the plaintiff files a nonsuit, but still within the
time period of the trial court’s plenary jurisdiction.  251 S.W.3d at 469 (quoting Scott & White Mem’l Hosp. v. Schexnider,
940 S.W.2d 594, 596 (Tex. 1996)).  The
court noted that, in Schexnider, it
held that “Rule 162 did not affect a trial court’s authority to hear motions
for sanctions during its plenary jurisdiction” and it further held, in Villafani, that Rule 162 does not
prevent a non-moving party from appealing rulings on claims for affirmative
relief that the trial court issued prior to the nonsuit.  Id.
at 470; see also Travelers Ins. Co. v.
Joachim, 315 S.W.3d 860, 865 (Tex. 2010) (holding that trial court retains
limited authority to dispose of case after nonsuit filed); Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon ex rel.
Shultz, 195 S.W.3d 98, 101 (Tex. 2006) (per curiam) (“Although [Rule 162]
permits motions for costs, attorney’s fees, and sanctions to remain viable in
the trial court, it does not forestall the nonsuit’s effect of rendering the
merits of the case moot.”).  We do not
read the rulings in Schexnider and Villafani as broadly as Cronan suggests—namely, that a trial court may automatically
exercise personal jurisdiction over a defendant in a suit following a nonsuit
if the defendant generally appeared in the first suit before the plaintiff
filed the nonsuit.  This interpretation
conflicts with well-established case law holding that a nonsuit extinguishes
the case and returns the parties to their positions before the plaintiff
invoked the trial court’s jurisdiction, with a few exceptions not applicable
here.  See, e.g., Villafani, 251
S.W.3d at 469.





[6]
          Even if Johnston lacked personal
knowledge and his affidavit was, therefore, defective, Waterman still presented
evidence supporting its special appearance. 
Rule 120a(3) does not require a party to file affidavits supporting a
special appearance, and the rule provides that the trial court “shall determine
the special appearance on the basis of the pleadings, any stipulations made by
and between the parties, such affidavits and attachments as may be filed by the
parties, the results of discovery processes, and any oral testimony.”  Tex.
R. Civ. P. 120a(3); see also Exito
Elecs. Co. v. Trejo, 142 S.W.3d 302, 307 (Tex. 2004) (noting that, in
addition to corporate officer’s affidavit, record also contained pleadings and
deposition of Exito’s corporate representative).  The special appearance record in this case
contained Johnston’s affidavit, as well as the depositions of Johnston and Mike
Cameron, both of whom testified to the information contained in Johnston’s
affidavit.





[7]
          Appellees do not contend that
Waterman and Maersk are subject to specific jurisdiction; thus, we address only
general jurisdiction.





[8]
          The parties entered into a Rule
11 agreement during jurisdictional discovery limiting the time period for
determining contacts with Texas from January 1, 2003, to October 6, 2009, the
date Ruiz sued.  We refer to this time as
the “jurisdictional discovery period.”





[9]
          Appellees contend that Waterman
had vessels dry docked in Texas.  Peter
Johnston testified that Waterman had not had a vessel dry docked in Texas for
the past fifteen years, outside the agreed period for jurisdictional discovery.

 





[10]
        Peter Johnston testified that the
time-charterer gives “specific instructions” regarding “which agents to use at
what ports,” and the charterer, not Waterman, appoints the port agents.





[11]
        Choice Auto Brokers, Inc. v. Dawson, 274 S.W.3d 172 (Tex.
App.—Houston [1st Dist.] 2008, no pet.), involved a website that allowed users
to e-mail CAB through the website to schedule test drives and to request
additional information, but did not permit users to directly purchase vehicles
or contract with CAB.  We determined that
this website was “interactive,” but concluded that we must look to CAB’s other
contacts with Texas to determine if jurisdiction existed.  Id.
at 178.  Dawson suggests that being able to contact the nonresident company
through the website—regardless
of how the company is able to respond to the potential customer—is enough to move a
website from the “passive” to the “interactive” category.  If so, then Waterman’s website, which
unequivocally allows users to contact Waterman through e-mail links, would be
considered “interactive.”  Because,
however, it is also undisputed that users cannot directly contract with
Waterman through the website, then this website is merely a factor to consider
and we must look to Waterman’s other contacts with Texas to determine jurisdiction.





[12]
        Cronan’s counsel asked Hopkins
whether Maersk vessels call upon Houston twice a week.  Hopkins replied that he was not sure, and
“[he thought] so, but, you know, there could be weeks when we don’t call.”  Cronan’s counsel asked Dennis Houghton, Maersk’s
Marine Personnel Director, whether Maersk vessels make regular calls upon Texas
ports, and Houghton responded that he did not know what counsel meant by
“regular calls” and that the vessels, “depending on the cargo that is booked
for the vessel,” go to the particular port to load the cargo.

 





[13]
        Appellees contend that Maersk
“pays $50,000–$75,000 per day to Texas vendors for goods/services that were
provided/performed solely in Texas, for a total of more than $370 million
between January 2003 and October 2009.” 
To arrive at this figure, appellees appear to have taken the total
amount Maersk paid to Texas vendors and then divided that amount by the number
of days between January 1, 2003 and October 6, 2009.  The $370 million total amount also includes a
$227,000,000 payment that Maersk made to its immediate parent company as a
“short-term loan . . . for cash management purposes.”





[14]
        Beginning in 2007, Maersk, Inc.,
Maersk’s immediate parent company, paid franchise taxes for Maersk and its
other subsidiaries.  Steve Hadder
testified that, eventually, Maersk, Inc. would require Maersk to pay back its
share, although it had not so required as of the date of Hadder’s deposition.

 





[15]
        Houghton’s trips to Texas for the
A&M career fair are discussed in greater depth in the separate section
regarding solicitation of employment.





[16]
        Hopkins testified that Maersk has
been sued by Flanagan Stevedoring Company and Commodity Solutions, LLC for
failure to pay for services rendered.





[17]
        Maersk objected on the ground that
the printouts indicated that appellees printed the documents on April 19, 2010,
and the relevant time period for determining Maersk’s contacts with Texas ended
on October 6, 2009, the date Ruiz filed suit. 
Maersk does not complain on appeal about the trial court’s ruling
admitting this evidence, nor does Maersk contend that the routes depicted in
its “North American Service Guide,” dated 2009, were any different before the
jurisdictional discovery cut-off date.





[18]
        Furthermore, it is undisputed that
Waterman and Maersk did not file a notice of past due findings and conclusions
before they filed their notices of appeal in this Court.  The failure to file a notice of past due
findings and conclusions waives the right to complain about the trial court’s
failure to file findings and conclusions on appeal.  I &
JC Corp. v. Helen of Troy L.P., 164 S.W.3d 877, 885 (Tex. App.—El Paso
2005, pet. denied).